CASE 94.—ACTION BETWEEN J. W. JONES & OTHERS AND
    PATTERSON AND THE DAVIS HEIRS TO RECOV-
    ER LAND.—June 28, 1902.

## Jones, &c. v. Patterson, &c.
## Patterson v. Davis, &c.
## Davis, &c. v. Patterson.

Appeals from Breathitt Circuit Court.

From the judgment Jones, &c., appeal.—Affirmed
in part and reversed in part.

1. Deeds—Land Conveyed, to Which Grantor had no Title.—
   The mere fact that a deed includes land which the grantor
   had a right to convey, did not vest his vendee with either
   title or possession of land which had not a valid legal title,
   although both contracts are covered by the deed.

2. Outstanding Title.—Where a party has had land in possession
   for more than the statutory period, one wrongfully entering
   thereon can not defend his own wrong by showing that there
   is an outstanding title in another, with whose title he has no
   connection.

3. Presumption in Favor of Judgment.—After a lapse of twenty
   years it will be conclusively presumed in a collateral proceed-
   ing that the ordinary preliminary steps had been taken, par-
   ticularly where the heirs of the party affected by the judg-
   ment, which conveyed land, lived upon an adjacent tract of
   land, acquiesced in the judgment.

W. B. DIXON and MARCUM & POLLARD for appellant, Jones,
&c.

R. S. HURST, W. W. M'GUIRE, W. S. PRYOR, HAZELRIGG &
CHENAULT and J. J. C. BACH for appellees, Patterson, &c.

J. J. C. BACH for Davis Heirs.

OPINION OF THE COURT BY JUDGE BURNAM.

The controversy in this case involves the title and ownership of about three thousand acres of land located upon the waters of the south fork and the tributaries thereof of Quick Sand Creek in Breathitt county, Kentucky. The appellees, Patterson and the Davis heirs, claim under fifteen Kentucky patents issued to Robert P. Davis in 1867. There is also a controversy between Patterson and the Davis heirs as to the ownership of the land, but both agree that appellants have no interest therein. The appellants, J. S. Stone, D. D. Jones, D. R. Clark, C. J. Little, Taylor & Crate, claim a possessory title dating from an alleged entry upon the land by one Preston Howard their remote grantor. They also claim to trace their title to a patent issued to James Reynolds by the Commonwealth of Virginia on the 18th, day of July, 1784, containing 126,140 acres of land. They also allege that the Davis patents are void for the reason that the land embraced therein is covered by the Reynolds patents and numerous other senior patents granted by the Commonwealth of Kentucky.

The action was originally brought at law by appellant against J. W. Cardwell for trespass. They alleged that they were the owners and in possession of about three thousand acres of land. The appellee Patterson intervened in this suit and asserted title to twenty-two hundred acres of land embraced within the boundaries claimed by appellant by virtue of a conveyance from Davis and the Davis heirs. He also alleged that certain deeds, under which appellants claim, were forgeries, and asked that he be adjudged the owner of the land claimed by him. Appellants in their response to Patterson's petition averred that his claim was a cloud upon their title and ask that it be quieted. Patterson in a subsequent

pleading responded that no one had ever had the
actual possession of the lands in controversy, that
they were uninclosed wild lands.  He also made his
pleading a cross-petition against the Davis heirs, who
replied denying title in the appellee Patterson, and
asserting title in themselves.  And in an amended an-
swer which they make a counterclaim against ap-
pellants, the Davis heirs assert ownership in them-
selves and allege that appellants had forcibly en-
tered upon the land and sought to recover of them
both possession and damages.  The trial court sus-
tained the title of appellees, and gave judgment
against appellant for the possession of the land, re-
fusing the relief sought by Patterson against the
Davis heirs, and also that sought by them against
Patterson.  Both of whom base their claim upon the
14 patents to R. P. Davis in 1867, which make out a
prima facia case for the appellee for the whole of the
land in controversy.

We will first direct our attention to an examina-
tion of the facts upon which appellants rely to es-
tablish  their possessory title to the land in contro-
versy, and also their claim that it had been previous-
ly patented and that by reason thereof the patents
to Davis were void.  It is conceded that Preston
Howard lived for many years at the mouth of a
stream known as Howard's Fork, which empties into
the South Fork of Quick Sand Creek, and that How-
ard's Fork has three tributaries known as Wilson,
Calhoon and Haggin's Forks, which empty into it
about one mile and a half above its mouth, and that
the lands in controversy are situated on these three
forks above what is known as Flat Rock on Wilson
Fork, the rock house on Calhoon Fork and a beech
and lynn on the Haggin's Fork, and it is earnestly
insisted by appellees that none of appellant's gran-

tors ever had any possession above these well known marks. A great deal of difficulty and uncertainty arises from the fact that the records of the Breathitt county court were burned in 1873, it being insisted that the titles which were subsequently recorded were to a large extent fictitious and forgeries.

Preston Howard's first paper title to any of the land in dispute is a deed executed to him on the third day of March, 1841, by Coleman Williams, in consideration of $150 paid cash in hand. Williams conveyed a certain tract of land described as:

"Beginning on the south bank of the South Fork of Quick Sand Creek at two sycamores and a sugar tree, 20 poles above the upper corner of a one hundred acres survey in Perry county, thence running up the creek on both sides, including its tributaries to a conditional line made by Williams and Howard."

And in 1853 Howard obtained a patent for fifty acres on Howard's Fork extending up to a poplar, beech and flat rock on the Wilson Fork. He settled his son Russell on that part of his boundary which was located farthest from the mouth of the creek. In 1864, Howard moved away from this tract of land and went to Jackson county, where he resided until his death. In 1886 in consideration of $1,000, he conveyed to Stephen Carpenter all of his land in Breathitt county on the waters of the south fork of Quick Sand Creek, which is described as beginning at a:

"White walnut on a small island, near an old school house at the lower end of the farm, and running to a conditional line between Preston Howard and Henry Williams at a double maple at the mouth of a small drain on the south side of the south fork of Quick Sand Creek; thence a straight line across said creek, thence with Howard's outside line so as

to include all the land owned by Howard lying between him and Henry Williams, Robert Davis and Russell Howard, going still around with his outside line to the beginning, containing four hundred acres to same, more or less."

When this deed was again recorded after the burning of the county clerk's office, it was altered so as to call for fourteen hundred (1,400) acres instead of four hundred (400) the original deed being in existence and filed in this record, makes this fact apparent. After his purchase Stephen Carpenter occupied the Howard residence near the mouth of the creek until February, 1873, when he conveyed to William Kash, and on the same day Kash conveyed to Elizabeth Williams the boundary conveyed to him. Both of these deeds call for 600 acres. The land conveyed is described as lying on the south fork of Quick Sand Creek, and does not embrace the 150 acres above it, which had been previously sold by Stephen Carpenter to Samuel Carpenter. After his purchase Williams occupied the old Howard house about fifteen years. During this interval, it does not appear that he ever acquired any additional land, but in June, 1889, he executed a deed to a boundary to the appellant, which he represents as containing 2,640 acres. At this point for the first time the deed purports to convey a tract of 2,000 acres of land which it is claimed Preston Howard held under a marked boundary whilst he lived in Breathitt county, and under a deed from Thomas Sewell, and to have been in Howard's deed to Stephen Carpenter, and to have passed from Carpenter to Kash and Kash to Williams. This two thousand (2,000) acre boundary extended to the waters of Calhoon and Haggin's Forks of Howard's Creek and not only covered the

boundary of land embraced in the deed from Stephen to Sam Carpenter, but also includes the greater part of the land covered by the patents issued to Davis, and which are included in the lands claimed by appellee, Patterson. The deed referred to from Thomas Sewell to Preston Howard purports to convey a certain tract of land lying on the south fork of Main Quick Sand Creek, and is described as follows:

"Beginning at a small island, two sycamores, one sugar tree; thence up the creek on both sides, including its tributaries to a conditional line between Preston Howard and Henry Williams, about 2,000 acres, more or less."

The deed further recites that the boundary is a portion of the Reynolds' survey which the grantor purchased of John Hargis and the consideration recited in the deed is a compromise and ten dollars ($10) paid cash in hand. It will be observed that the description contained in this deed is the identical description contained in the deed from Coleman Williams to Preston Howard in 1841, and seems to be the boundary embraced in the deed made by Preston Howard to Stephen Carpenter in 1869, except that the sale represents the land to be 2,000 acres more than the Howard deed speaks of it as containing. But in the meantime Preston Howard had conveyed one hundred and fifty acres of land held by him when he resided at the mouth of Howard's Creek to his son Russell. The facts surrounding the deed from Sewell to Howard are to say the least somewhat suspicious. It purports to have been acknowledged by Sewell in 1849, before William Barnett D. C. for John Hargis of the Breathitt county court, but does not seem to have been recorded until the third day of June, 1886, and then by a party who testified that

he was not a deputy clerk at all.  It further appears
that as soon as it was recorded the original deed was
withdrawn from the clerk's office, and the most dili-
gent efforts have entirely failed to show any trace of
it thereafter.  In March, 1889, shortly before the
execution of the Williams deed to appellant, Preston
Howard and his wife, who it is claimed were then re-
siding in Jackson county, Kentucky, executed a deed
to their grandson Asberry Howard, of Breathitt
county, in consideration of $500 to a tract of land on
Quick Sand Creek, containing two thousand (2,000)
acres, and which the deed recites to be a part of the
boundary of land which the grantors had purchased
of Colby Williams, and the boundary of this deed
seems to cover substantially the same land which is
subsequently embraced in the deed from Williams
and wife to appellant.  This deed was executed by
Preston Howard more than fifteen years after his
removal from Breathitt county, and one of his sons
testified that he had been dead for several years be-
fore the date of its execution.  It further appears
that this same Berry Howard, a grandson of Preston
Howard, obtained possession of the title bond which
had been executed by Stephen Carpenter to Samuel
Carpenter, and claimed to be the owner of the one
hundred and fifty (150) acres tract of land covered
by the bond sometime previous to the date of Wil-
liams' deed to appellant.  Stephen testifies that this
bond only called for 150 acres of land, but that Berry
Howard represented that he had contracted to sell a
boundary of 394 acres to the Quick Sand Lumber
Co., and proposed to Carpenter that if he would in-
crease the number of acres so as to make it call for
394 acres instead of 150 that he would give him
twenty-five dollars ($25) in cash and accept a quit

claim deed therefor, and that he did so although he well knew that he had only sold Samuel Carpenter 150 acres of land. It further appears that Berry Howard sold and conveyed this tract of land to the Quick Sand Lumber Co., in 1888, and that they were in possession thereof under their deed at the date of the Williams deed to appellant.

The appellants relied as a link connecting their chain of title with the Reynolds' grant on a deed, which purports to have been executed in February, 1848, by John Hargis to Thomas Sewell, which contains this recital:

"Also the said John Hargis and wife hereby aliens, sells and quits claim of said Sewell the balance of his out land, or sheriff's deed, which Hargis has not sold to others. And this last land or sheriff's deed contains say from 15,000 to 25,000 acres, more or less. The boundary is of record, deed book number 1, pages 216 and 217. This only includes Hargis' part yet unsold. All the above lands being on the north side of the north fork of the Kentucky river in Breathitt county, Kentucky, above and below the town of Jackson and described as aforesaid in the conveyance of the old thousand acre tract." The deed further stipulates that neither Hargis nor his heirs are to be in any way accountable as to the warranty of this old thousand acre tract.

It is admitted by counsel that the recitals of this deed and those contained in the deed from Sewell to Howard are the only evidence which connects the title of Preston Howard in any way to the Reynolds' patent. It is also admitted that when Williams had his deed recorded after the fire there was inserted in the boundary for the first time the words "including its tributaries." It also appears that the same

Williams' grantor was the party who produced and had recorded apparently for the first time the alleged deed from Sewell to Howard long after the death of Sewell. But even if it be conceded that the Sewell deed was not a forgery, the proof in the case clearly shows that neither Howard nor his vendee Stephen Carpenter ever claimed under it. This is shown by the fact that in 1853, Howard obtained a patent for fifty acres of land on Howard's Creek, which extended to the poplar, beech and flat rock on the Wilson fork, and subsequently took out two additional patents of twenty-five acres each for land which were clearly covered by the Sewell conveyances. And Stephen Carpenter, his vendee, obtained two patents for two hundred acres each. And he testifies that one of them:

"Began at the lower end of his farm and ran up the left hand fork of South Fork up the ridge between Davis' land and Howard's Fork until they struck the big rock house on Calhoon Fork, thence a straight line to the beginning."

That 'the other two hundred acre patent began:

"At the mouth of a drain on Calhoon's Fork, just above the rock house, and ran across the spur of the beech and lynn on Haggin's Fork; thence down Haggin's Fork to the McDonald Fork; thence up the spur of the ridge to the top of the ridge, and thence down the ridge between Howard's Fork and the water of South Fork to two maples."

Whilst John McDaniel, Sam Carpenter and C. B. McQuinn, all of whom live in the immediate neighborhood, testify that the upper lines of Preston Howard's farm, at the time he lived there, was at the poplar, beech and flat rock on Wilson's Fork, the beech and lynn on Haggin's Fork, and to the rock house on

Calhoon's Fork. The location of these lines of How-
ard's farm seem to have been so well known that
when Davis, who lived on the adjacent tract of land,
and who was a practical surveyor, made the surveys
which are the basis of the patents relied on by ap-
pellee, he began them at these well known objects,
two of them beginning at the flat rock on Wilson
Fork, two at the rock house, and a fifth at the lynn
and beech. And undoubtedly the 150 acre tract of
land conveyed by Stephen Carpenter to Sam laid di-
rectly between the land of Stephen Carpenter and
the alleged marked boundary around the ridges,
which in the main is the same land that is in contro-
versy. Besides it is evident from Howard's deed
that he only sold the land on the main creek on the
conditional line between him and Williams, and up
to the McDaniel and Russell Howard tracts, both of
which lay above the tract claimed by him at that time,
and the tributaries of Howard's Creek. Besides it
is by no means certain that the land embraced in
the deed of Hargis to Sewell covers the land in con-
troversy. The alleged conveyance by the sheriff to
Hargis is not produced nor are any of the proceed-
ings under which the judgment was obtained upon the
execution issued attempted to be shown. We are of
opinion the proof offered by appellant is insufficient
to connect them with the Reynolds' patent.

But appellants argue that even if the Reynolds'
patent does not cover the land, that it is shown that
Preston Howard lived on and claimed the land in
controversy for more than twenty-three years after
his purchase from Coleman Williams and for more
than fifteen years after obtaining the deed from Se-
well, and that his actual possession extended to the
marked boundary, which he claimed; and that these

facts are sufficient to authorize the presumption of
a grant from the Commonwealth. It is true that Rus-
sell and Miles Howard, sons of Preston Howard, in
their depositions given about forty years after they
moved off the land and long after the death of their
father, give some color to the contention. But this
proof is insufficient to rebut contemporaneous acts,
and the declarations of the conveyances as to the
amount of the land conveyed by Howard and acquired
by Carpenter. Carpenter testifies that Howard told
him that the rock house on Calhoon Fork was his
upper corner on that fork. And John McDaniel testi-
fies that Howard told and showed him that his upper
line crossed Wilson Fork at that rock and Calhoon
Fork at the rock house and Haggin's Fork
at the beech and lynn. And similar tes-
timony is · given by McQuinn. It is perfect-
ly clear that the boundary which Carpenter
conveyed to Kash crossed Howard's Fork below
the mouth of Wilson and Calhoon Forks, leaving the
land which he had sold to Sam Carpenter between the
residue of his farm and the land in contest. It should
also be remembered that Carpenter purchased a con-
siderable boundary from McDaniel while he was in
possession. Williams never claimed to own the Sam
Carpenter boundary under his purchase from Ste-
phen Carpenter, nor is it contended that he ever had
actual possession of this tract of land, although it
was undoubtedly covered by his conveyance to appel-
lants in 1889. After their purchase from Williams
in June, 1889, appellants put John Russell as their
tenant in the house which had been occupied by Wil-
liams at the mouth of Howard's Fork and leased to
him, not only the land to which Williams had an
undoubted title, but also all the land in controversy
and shortly after their lease to Russell they built a

cabin on the land in controversy and put a woman in possession of it. This seems to have been the first effort on the part of appellant to acquire claim by adverse possession to this boundary, but as this was only four years before the institution of this suit it was insufficient to vest them with title. By their purchase from Williams appellants acquired title to a very considerable boundary of land, but the mere fact that the deed from Williams included land which he had a right to convey did not vest his vendee with either title or possession of land to which he had not a valid legal title, although both tracts are covered by the deed. Trimble v. Smith, &c., 4th Bibb., 256; Boswell on Limitation & Adverse Possession, section 268.

Appellants have failed to show their title or possession to the land in controversy, as the cabin built on the land and the installation of a tenant therein after the institution of this suit cannot affect the rights of the parties. But it is contended that if appellants have shown no right to relief that appellees are in no better condition, because the patents issued to Davis in 1867, are void for the reason that senior grants both from the State of Kentucky and the Commonwealth of Virginia cover the same land. Appellants, however, cannot avail themselves in this litigation of this well settled rule. As said by Judge Mills, in Fowke v. Darnell, 15 Ky., 320:

"Courts in modern times have leaned considerably against permitting a defendant, who comes in by wrong, from protecting that wrong by the titles of others with which they are unconnected."

And in Sowder v. McMillan, 31 Ky., 456, it was held that when the possession of plaintiff is shown (and in this case appellees) undoubtedly hold the

constructive possession of the land in controversy by reason of their paper title.

"And the entry upon it by the defendant, the right to recover cannot be resisted by showing that there is an outstanding title in another, but only by showing that the defendant himself, either has title or authority to enter."

And the rule announced in this case was quoted and approved in Ratcliff v. Bellfonte Iron Works Co., 87 Ky., 559, and in Sternbridge v. Britschu, 14 Reporter, 408. In the last case it was decided that the plaintiffs having had possession of the land for more than the statutory period, the defendant could not defend his own wrong by the title of others with whom he had no connection. We, therefore, deem it unnecessary to determine whether the third line of the Reynolds' patent extended beyond Quick Sand Creek, or to consider the alleged senior patents spoken of by the witness Thurston, as there is no claim that appellants connect with any of these alleged patents.

Cross appeals have also been prosecuted from the judgment of the circuit court by appellee Patterson v. The Davis Heirs, and by the Davis Heirs v. Patterson. Their contention grows out of a judgment of the circuit court which adjudges to the Davis heirs a part of the 2,200 acres of land described in the fourteen patents from the Commonwealth of Kentucky to R. P. Davis. The facts out of which this controversy grew are that in June, 1865, R. P. Davis sold and conveyed to Patterson 5,000 acres of land on Calhoon Fork of Howard's Creek, in consideration of $5,000. In April, 1866, Patterson sued Davis, alleging that there was only about 1,400 acres of land embraced in the boundary, and prayed a can-

cellation of the deed, and a judgment against Davis
for $2,145, the amount he paid. This suit was com-
promised and a written agreement entered into be-
tween Davis and Patterson, in which Davis agreed
to procure from the Commonwealth patents for the
2,400 acres of land, including the land covered by this
deed, and was to keep $1,800, which had been paid to
him by Patterson, and to refund $345, the parties
being allowed eight months in which to execute their
covenants. Davis kept all of the $2,145, but procured
warrants for 2,400 acres of land including the 1,400
acres covered by his original deed, on which patents
issued, but before he could execute a deed to Patter-
son he died; and thereafter his widow and admin-
istratrix instituted suit against Patterson in the
Breathitt circuit court asking for a specific perform-
ance of the contract between her husband and Pat-
terson. And the court so decreed, and directed a con-
veyance of the lands to be made to appellee by a
special commissioner, which was done. The deed
was examined and approved in open court in Octo-
ber, 1867. This judgment is attacked in these pro-
ceedings by the heirs of Davis on the ground of cer-
tain alleged irregularities in the preliminary steps.
First, it is contended that there was no affidavit for
a warning order, and, therefore, Patterson was not
before the court. Second, that the answer of the
guardian ad litem was not signed. Third, that the
patents referred to in the petition and made exhibits
were not formally filed, that the judgment did not
specifically describe the land, etc., it being contended
that on account of these irregularities Patterson ac-
quired no title under the judgment and deed made to
him by the commissioner, and that they as heirs at
law of Davis, are vested with the legal title and

should be adjudged possession of the land in controversy. It appears that the greater part of the land in controversy was included in and passed under the deed made by Davis in his life time, and nearly all of the alleged irregularities complained of in this case were relied on in the case of Newcomb, Ex. v. Newcomb, 76 Ky., 544, where it was said after a full investigation of the authorities, ''that the presumption is always indulged in favor of the jurisdiction of courts of general jurisdiction, and they cannot be assailed in collateral proceedings and adjudged void for the reason that some preliminary steps to be taken in the inception of the action are not found among the files of the clerk, in whose office they are required to be kept.'' And in Barry v. Foster, 22 Rep., 745, it was said that after the lapse of twenty years, it would be conclusively presumed in a collateral proceeding that the ordinary preliminary steps had been taken, and these reasons apply with peculiar force to the case at bar. The judgment was rendered more than thirty years ago, and has been acquiesced in by the heirs of Davis, although they lived upon an adjacent tract of land, and the record shows a substantial compliance with all of the requirements of the statute.

For reasons indicated the judgment is affirmed upon the original appeal, and upon the cross appeal of Davis, &c. v. Patterson; and reversed upon the cross appeal of Patterson v. The Davis Heirs, and cause remanded with instructions to adjudge Patterson the owner of all the land covered by the deed made to him under the judgment of the Breathitt circuit court by A. R. Patrick, Commissioner.