KENTUCKY COAL & TIMBER DEVELOPMENT CO. v. KENTUCKY
UNION CO. et al.

(District Court, E. D. Kentucky. January 21, 1914.)

No. 2495.

1. PUBLIC LANDS (§ 151*)—LOCATION OF ENTRIES OF STATE LANDS.

In locating an entry of state land in Kentucky in accordance with the
certificate of survey and the patent, where the description contains a
number of elements, the location should be made to conform to all of
such elements, if possible, and, if not, to as many of the more material
elements as possible, including fixed monuments, natural or identified
boundaries, and quantity, and bearing in mind that, as between courses
and distances, the former are to be preferred, and that under the law
of the state a rectangular shape is to be preserved, when consistent with
the entry.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 411–437;
Dec. Dig. § 151.*]

2. PUBLIC LANDS (§ 151*)—LOCATION OF ENTRIES OF STATE LANDS—ENTRY AS
EVIDENCE.

Under the law of Kentucky, in locating an entry of state lands the
court cannot look beyond the patent, and although the certificate of sur-
vey may be considered for the purpose of correcting any mistake in
transcribing the description into the patent, the entry itself, if admissible
for any purpose, as it may be only in case of ambiguity in the descrip-
tion in the certificate and patent, is not controlling as to the boundary.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 411–437;
Dec. Dig. § 151.*]

3. EVIDENCE (§ 274*) — DECLARATIONS AS TO BOUNDARIES — DECEASED SUR-
VEYORS.

The Kentucky decisions do not preclude the admission in evidence of
declarations of persons since deceased as to the lines and landmarks of
ancient private boundaries, and such a declaration with respect to a
boundary 125 years old, made by a surveyor near the same time in the
course of his official duty, as shown by his record of subsequent surveys,
and on which numerous other surveys were based, is admissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1121–1134;
Dec. Dig. § 274.*]

4. ADVERSE POSSESSION (§ 103*)—EXTENT OF POSSESSION—RELATION TO EACH
OTHER OF DIFFERENT PARTS OF SAME PREMISES.

If a person enters upon and takes possession of land within a well-
defined boundary, under claim of ownership to such boundary, there is a
presumption that he intends to take possession to such extent, and it
gives possession to that extent, if nothing else appears; but if he has the
right to enter upon a part of the land within the boundary, and not to
enter on another part, and his actual entry is only on the part to which
he has the right, he acquires no possession beyond such part, although
he may intend to take possession of the whole; and the same rule applies
to the possession of his grantee, although the conveyance is to all the
land within the boundary. If, however, his entry is on the part to which
he has no right, or is extended to any portion of such part, however
small, his possession will extend to the entire boundary, if so intended,
and be adverse to the true owner of such part.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 590–
594; Dec. Dig. § 103.*]

In Equity. Suit by the Kentucky Coal & Timber Development Com-
pany against the Kentucky Union Company and others, in which J.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

M. Noble and Louisa H. Goodlett intervene by cross-bill. On final hearing. Petition of intervention and cross-bill dismissed, and decree for defendant.

S. D. Rouse, of Covington, Ky., and J. J. C. Bach, of Jackson, Ky., for plaintiff.

W. B. Dixon, of Louisville, Ky., for defendant.

J. W. Gaines, of Nashville, Tenn., for interveners.

COCHRAN, District Judge. This cause is before me for final decree. As originally brought, it is a suit by the plaintiff company against the defendant company to enjoin the cutting of timber growing on a certain tract of land in Breathitt county, in this district, on the waters of the South fork of Quicksand, a tributary of the North fork of the Kentucky river, the title to which is in dispute between them; and the sole question it involves is as to the ownership thereof. The plaintiff claims ownership under a patent from the commonwealth of Kentucky to Stephen. G. Reid, of date June 15, 1872, the same under which its immediate predecessor in title, the Breathitt Coal, Iron & Lumber Company, claimed ownership of the tract of land involved in the case of Taylor & Crate v. Breathitt Coal, Iron & Lumber Co., 185 Fed. 854. The defendant company denies plaintiff's ownership and claims title in itself by adverse possession. As plaintiff has connected itself with the Reid patent, and the land in dispute is within the boundaries thereof, the question of ownership in dispute between the two companies is limited to whether title has been divested from those claiming under the patent and vested in the defendant company by adverse possession.

Pending the suit the defendants Noble and Goodlett intervened, and claimed that they were the owners of the land. They so claimed under two patents from the commonwealth of Virginia to James Reynolds, of date May 18, 1786; i. e., before the separation of Kentucky from the mother state. By one patent a tract of 126,140 acres was granted, and by the other one of 50,000 acres; the two adjoining. Their claim was of the ownership of the north half of the 126,140 acres and the whole of the 50,000-acre tract. I do not understand that the claim is that any portion of the land so in dispute is within the north half, or any portion, of the 126,140-acre tract. The claim is that it is wholly within the 50,000-acre tract; the sole reliance on the 126,-140-acre tract being as an indispensable aid to the location of the 50,-000-acre tract. Seemingly the claim of the intervening defendants is not limited to the land in dispute between the original parties, but includes other lands claimed by the plaintiff under the Reid patent and the defendant company by adverse possession, which they claim is within the 50,000-acre tract. By their cross-bill they seek to be adjudged to be the owners of all the land so claimed by them, and that plaintiff and their codefendant be enjoined from committing any trespass thereon. This claim of ownership is denied by both defendants to the cross-bill, and the defendant company asserts title by adverse possession as against them also.

After the preparation of the case, and pending its consideration, the defendants by written stipulation settled the controversy between them. Thereby they agreed that the original defendant is the owner by adverse possession of certain portions of the land in contest between them, and that the cross-bill be dismissed as to same without prejudice as to other portions. I am unable to tell whether the land which it has been so agreed the original defendant owns by adverse possession is the whole of the land in dispute between it and plaintiff. If it is, the intervening defendants have no longer any concern in the ownership thereof. Their concern would be limited to so much of the Reid patent outside of the land in dispute between plaintiff and their co-defendant as it claims is within the 50,000-acre tract. But in that contingency, even, the question whether the land so in dispute is within the 50,000-acre tract would still be relevant. It would be relevant in connection with the controversy between those parties; for, if it is, then the plaintiff is not the owner thereof, and the original defendant is entitled to a dismissal of the bill on this ground alone, and this would relieve me of the necessity of passing on the question whether the original defendant had acquired title thereto by adverse possession as against plaintiff.

I proceed, therefore, to a consideration at once of the question whether the 50,000-acre tract covers any portion of the tract which plaintiff claims. This depends on whether the former tract is located as the intervening defendants have always claimed, and the original defendant now claims, it is. If it is not so located, then it does not cover any of the portion of the Reid patent. The burden is on the defendants to make good the claim that it is so located.

The 50,000-acre tract is four-sided. It is a rectangular parallelogram of greater breadth than length. The description in the certificate of survey and the patent is exactly the same. It is described as being in Fayette county, Va., and is not otherwise described generally. The specific description given is as follows, to wit:

"Beginning at the third corner of a survey of an entry made by Jacob Weaver, John Phillips & Company on the left or north fork of Kentucky (126,-140 acres) at a poplar and two white oaks and running thence N. 81° E. 3,000 poles, to B, an ash; thence S. 9° E. 2,666⅔ poles, to C, a black walnut; thence S. 81° W. 3,000 poles, to D, a sugar tree and buckeye; and thence N. 9° W. 2,666⅔ poles, to the beginning, having crossed two small runs on the fourth line."

The timber called for at each of the four corners, to wit, a poplar and two white oaks at the first, an ash at the second, a black walnut at the third, and a sugar tree and a buckeye at the fourth, have not been identified. Indeed, it is agreed that they never had any existence. The law, as it then stood, required the surveyor, in the making of a survey, to see that it was "bounded plainly by marked trees, except where a water course or ancient marked line shall be the boundary"; but this he often failed to do. Indeed, he would not go on the land at all, except possibly to mark the beginning corner, or to so do and run a line or so. He would make the survey in whole or in part by protraction, and call for imaginary trees at the corners not actually

marked. Such a survey would be the basis of the certificate on which the patent would issue. The neglect on his part to comply with the statute did not invalidate the survey, as its requirement was directory merely.

As stated, it is agreed that the survey covered by the certificate and patent for the 50,000-acre tract was an office survey, and that wholly so. The surveyor did not go on the ground to mark so much as the beginning corner. There is nothing, therefore, in the calls for trees at the corners that enables it to be identified. The letters called for, to wit, A, B, C, and D, are letters on the plat accompanying the certificate of survey. The two small runs called for are also shown on the plat crossing the fourth line as stated in the certificate. There is nothing in the call for these two small runs or the course or shape of them on the plat to help in identifying the land. The position that the survey was an office survey and that the two runs and the course and shape given them on the plat are an aid to the location of the boundary are inconsistent.

But for one call, then, the land would be incapable of identification. That call is for the third corner of the survey of the entry for the 126,140-acre tract, said to be on the left-hand or North fork of the Kentucky river, as the beginning corner of the boundary. If the third corner of that survey can be identified, then the beginning corner of the 50,000-acre tract can be identified also, and the tract fully identified. Otherwise this cannot be done. The crucial question here, then, is as to the location of that third corner. It will be noted that the call is for the third corner of the survey of the entry for the 126,140-acre tract, and not for any corner of that entry. At that time no patent had been issued; and if we go by the certificates of survey for the two tracts of land, there had not been any survey of the 126,140-acre tract. According to the certificate for the 50,000-acre tract, the survey was made June 30, 1784, and to that for the 126,140-acre tract it was made July 8, 1784. I take it that the meaning intended to be conveyed was, not that the surveys were made on those dates, but that they were then completed. Both surveys and certificates thereof were made by the same surveyor, to wit, Richard Ellis, deputy for Thomas Marshall. In making the survey for the 126,140-acre tract, as will later appear, he did go on the ground and do as much as mark a tree as the beginning corner; but in view of the fact that the certificate of survey for the 50,000-acre tract calls for the third corner of the survey for the 126,140-acre tract, it must be taken, notwithstanding the date of the completion of the latter is given as over a week later than that of the former, that Surveyor Ellis, before making the survey of the 50,000-acre tract, had marked the beginning corner of the 126,140-acre tract, and at least protracted the result thereof. But possibly the whole of the survey of the 126,140-acre tract rested in intention merely. The entry for the larger tract was earlier than that for the smaller. The date of the one is April 22, 1784, and of the other June 19, 1784.

This completes all consideration that need be given to the location of the 50,000-acre tract. The interest now shifts to that of the 126,140-acre tract, and particularly to the location of the third corner

214 F.—38

thereof. The 126,140-acre tract is four-sided also; and on the face of the certificate of survey and patent, which are the same, it, too, is a rectangular parallelogram, the length here being greater than the breadth. It also is described generally as lying and being in Fayette county, Va., and more particularly as on the left-hand or North fork of Kentucky river, hereafter referred to as the North fork. The specific description given is as follows, to wit:

"Beginning 15 miles from the mouth of said fork, when reduced to a straight line, at a small beech marked with the letters R. E. B., standing near the edge of said fork, being the uppermost corner of a tract of land entered by P. D. Roberts, Tarrason Bros. & Co. &c. and represented on the plat by the letter A and running along their land N. 9° W. 6,400 poles, to three sugar trees and a cherry at B; thence N. 81° E. 3,148 poles, to a poplar and two white oaks at C; thence S. 9° E. 6,400 poles, to the edge of the aforesaid left-hand or north fork of Kentucky; thence down the river their several courses viz.: S. 51° W. 240 poles, S. 75° W. 360 poles, N. 85½° W. 480 poles, N. 67° W. 140 poles, S. 28° W. 220 poles, west 800 poles, N. 46° W. 190 poles. S. 79° W. 240 poles, S. 64° W. 640 poles, to the beginning, but when reduced to a straight line is 3,148 poles."

The statement that on the face of things this tract is a rectangular parallelogram should be qualified. It is so, assuming the North fork line to be one straight line. But as it is not, and the tract runs with the meanders of the stream, it is not in fact a parallelogram at all. It is simply rectangular at its northern or outer end. No timber is called for at the fourth or upper corner—on the North fork. That called for at the second and third corners was imaginary. That called for at the third corner was a poplar and two white oaks, the same as called for in the description of the 50,000-acre tract, and the survey, except as to the beginning, was an office survey. There are three calls for the beginning corner, as follows, to wit: Fifteen miles from the mouth of the North fork, when reduced to a straight line; "the uppermost corner of a tract of land entered by P. D. Roberts, Tarrason Bros. & Co. &c.;" and "a small beech marked with the letters R. E. B., standing near the edge" of the fork. The second call is exactly the same as the first; i. e., the uppermost corner called for in the entry for that tract of land is 15 miles from the mouth of the North fork on a straight line. The tree called for was thought to be at the point called for by the other two calls. It is described in two particulars, one specific, to wit, "marked with the letters R. E. B.," the letters "R. E." no doubt standing for Richard Ellis, the surveyor, and the letter "B." for beginning; and the other general, to wit, "standing near the edge of said fork." If it was not at that point, but at a different one, the latter must be taken as the beginning corner, on the principle that distance must give way to monuments. Whether it was at that point or not will be considered later. For the time being I take it that it was, and dispose of the location of the land as thus described and of the third corner thereof on this basis.

This description contains elements which enable the land covered by it to be located. They are the call for the beginning corner, that for the line of P. D. Roberts, the Tarrason Bros. & Co. land, and that for the North fork. The North fork and its mouth are to-day, substan-

tially at least, where they were then. The call for the North fork requires that the land shall bind thereon and that whether the course and distances called for conform to it or not. If they do not, they must be rejected. In that contingency the two calls are inconsistent. Both cannot be followed, and of the two that for courses and distances must give way. There can be no question whatever as to this, and it is not essential to cite any authorities to support it. The location of the P. D. Roberts, Tarrason Bros. & Co. &c. land is known and not disputed. What makes the location of the 126,140-acre tract of land and the third corner thereof a problem calling for solution is that running a line N. 9° E. 6,400 poles from the third corner, taking it to be the point which would be reached by running the first line from the beginning corner with the line of the P. D. Roberts, Tarrason Bros. & Co. &c. land N. 9° W. 6,400 poles, and the second from thence N. 81° E. 3,148 poles as called for, will not strike the North fork. It comes short of so doing by more than its length; i. e., over 6,400 poles, or 20 miles.

The reason for this is that Surveyor Ellis in protracting the survey mistook the course of the North fork above the beginning corner. The way he came to make this mistake was this: The P. D. Roberts, Tarrason Bros. & Co. &c. tract of land contained 300,306⅔ acres of land. It was entered February 28, 1784; i. e., the winter before the entering and surveying of the 126,140 and 50,000 acre tracts of land. The entry called for a base line of 20 miles extending from the end of the 15-mile line heretofore referred to westwardly and down the river to the point where it strikes the river at the end of 20 miles, and for running lines from each end of this base line at right angles thereto until a line at right angles with the two last lines and parallel to the base line would include the quantity of 300,306⅔ acres. The survey thereof was made in the following May, after the entry of the 126,140-acre tract, but before the survey thereof and the entry and survey of the 50,000-acre tract. It was mainly an office survey. It was such except as to the base line and the meanders of the river. According to it the lower or western end of the base line of 20 miles struck the river below the South fork thereof at a point 5 miles below the junction of the North fork and the Middle fork. It was surveyed, not in one body, but in 22 different tracts, extending in five lines down from the river. The length of the side lines was 25 miles. The river between the two ends of the 20-mile base line curved away or northward somewhat from that line, but the base line followed the general course of the river. The course of the base line from the lower end to the upper, and also of the outer line parallel thereto, was N. 81° E., and of the two side lines N. 9° W. The survey was thus four-sided and a rectangular parallelogram, but for the river end, which was rendered crooked by the river on which it bounded. Each of the 22 tracts into which it was subdivided were rectangular parallelograms, except the five binding on the river, and they were only prevented from being such by the irregularities of the river, on which they bounded. All the lines of these 22 tracts extending from the river were N. 9° W.

or S. 9° E., and all the other lines, except those binding on the river, were N. 81° E. or S. 81° W.

This survey was made by Robert Armstrong, another deputy of Thomas Marshall. I have stated that the river on which it bounded was meandered in making the survey. This should be qualified by saying that it was meandered, except where the upper subdivision, allotted to E. Thompson, bounded on it. It is agreed that such was the case. It is a matter of inference from the fact that the meanders of the river as given on the plats for the separate subdivisions conform substantially to the meanders of the river as they are now, except on the plat for the E. Thompson subdivision.

Now, it is to be taken that Ellis, in making the surveys of the 126,-140 and 50,000 acre tracts, had the survey of the P. D. Roberts, Tarrason Bros. & Co. &c. tract and its subdivisions before him. Both were intended to be rectangular parallelograms, the same as that survey and its subdivisions, except so far as the 126,140-acre tract was affected by the North fork; and the southern or inner and the northern or outer lines thereof are N. 81° E. or S. 81° W. and the side lines N. 9° W. or S. 9° E., the same as in the case of the older survey. He did not survey the North fork so far as the 126,140-acre tract bounded on it. It is possible that he never went up it beyond the beginning corner. It is certain that he was at the beginning corner, as he took it to be, for he marked the small beech standing there on the edge of the river with the letters "R. E. B." And it is possible that he ascended the river above the beginning corner for a considerable distance—possibly as high up as Quicksand. The reason for admitting this possibility will appear later. But not surveying the North fork above the beginning corner and having the work of Armstrong before him, he took it that the course of the North fork above the beginning corner was substantially N. 81° E. or S. 81° W.; i. e., the same course as the base line of the P. D. Roberts, Tarrason Bros. & Co. &c. survey, and protracted his survey accordingly. This was not the case. The course thereof for some distance below the beginning corner was not in accordance with the base line of that survey. Instead, it was southeastwardly as you ascend, or northwestwardly as you descend. Above the beginning corner it continues this same course for some distance above the town of Jackson, and then turns abruptly to a south and north course. From that point for a distance of 15 miles it runs south as you ascend, or north as you descend, when it turns abruptly again to an east and west and a southeast and northwest course. Counsel for the intervening defendants thus states the course of the North fork above the beginning corner:

"The river runs 20 or 25 miles practically south, when it leaves the beginning point B, and then turns radically southeast."

As I make it, the river first ascends southeast for some distance from the beginning corner, just as below it, then turns south, and then southeast; but after it turns south it so bends that the beginning corner is almost directly north of it. Because of this change in the course of the North fork, the third line of the 126,140-acre patent, running S. 9° E. from the third corner thereof, taking it to be where it would be

if the courses and distances from the beginning corner are followed, instead of striking the North fork at the end of 6,400 poles, or 20 miles, and 3,148 poles, or about 10 miles, up from the beginning corner, strikes it above the town of Hazard at the end of nearly 45 miles from the third corner and over 60 miles above the beginning corner. If this be taken as the third line, and the river from the point where it strikes it to the beginning corner as the fourth line, we will have a boundary containing 256,000 acres, considerably over twice as much as the acreage called for.

It is this condition of things that presents us with our problem. Counsel for the plaintiff originally contended that the true location of the land was as first stated, by which it is made to include 256,000 acres, instead of 126,140 acres, as called for. His argument was that in thus going to the third corner the calls of the certificate of survey and patent are followed, and that as the next two calls are to go to the North fork, and thence with it to the beginning, leaving out the distance called for on the third line and the courses and distances called for in the fourth and closing lines, they should be followed and the calls for distances as to the third line and for courses and distances as to the fourth line rejected. But this is an impossible location, and, as it seems to be no longer insisted on, nothing further need be said as to it. I am not entirely sure what is the present position of plaintiff's counsel, and do not deem it necessary to make an attempt to state it. He seems to think that the third corner of the survey is at the point reached by running the first and second lines according to courses and distances from the beginning corner, and, as the description of the 50,000-acre tract calls for the third corner of the survey, and not of the patent, as its beginning corner, it must be located at that point, however the third corner of the patent may be located. But the third corner of the survey is not at a different point from that of the patent. The third corner of both is at the same point, so the location of the beginning corner of the 50,000-acre boundary depends on the location of the third corner of the patent for the 126,140-acre tract. If I mistake not, it is the position of defendant company's counsel that the third line should be dropped from that point in the same plane until it strikes the North fork and then the ends thereof connected by parallel lines with the beginning and second corners, thus yielding a rhomboidal, instead of a rectangular, parallelogram. According to this location the third corner will be at the northern end of the third line so dropped. It is the position of counsel for intervening defendants and their surveyor, Blakeman, that the North fork should be ascended from the beginning corner to such a point that a line connecting the second corner with the northern end of a line extending from such point N. 9° W. 6,400 poles will include 126,140 acres, the acreage called for. The northern end of the line so extended is the location of the third corner.

I do not understand these two positions to be the same. A location of the land either way places the third corner a few miles south of a line due east from the beginning corner and the whole of the third line opposite to and parallel with the major part of that portion of the North fork constituting the fourth line, instead of the third corner be-

ing over 20 miles north of such a line and the whole of the third line being opposite to and parallel to the first line, if the North fork had run as Surveyor Ellis assumed it to run. It also places the third corner so that, if it is taken as the beginning corner of the 50,000-acre tract, that tract will cover all the land in dispute—that according to the intervening defendant's counsel certainly so, and that according to the defendant company's counsel probably so. I will not undertake to respond directly to either of these two positions, but proceed to a solution of the problem along my own lines.

It is clear that the mistake of the surveyor does not render his work and the patent based on it void. Such is not always, or even generally, the effect of mistaken and repugnant calls in the description given in the certificate and patent. Such calls are rejected, so far as following them is concerned, and, if possible, a location is made according to the main intent of the description in the certificate and patent. I have sometimes said that such location is made as it is reasonable to conclude the surveyor himself would have made it, had he been aware of his mistake. Possibly this is an objectionable way of putting the matter. It seems to involve a new location, and this may be thought to be unfair to adjacent proprietors. But this way of putting it means no more than that the location should be made according to the main intent of the description in his certificate transcribed into the patent. It is possible that the location may to a certain extent be artificial. But it is deemed to be better that this should be the case, rather than that the patent should be overthrown. In determining the main intent, all the elements of the description should be considered, and it should be viewed in the "united light" of such of them as do not have to be rejected. It is the contention of intervening defendants that the entry pursuant to which the survey of the 126,140-acre tract was made should be considered in so determining. But for the time being I will leave the entry entirely out of consideration and limit myself wholly to the description contained in the certificate and patent.

This is the fourth time I have had occasion to consider the problem involved here; that is, how a four-sided tract of land should be located when there had been a mistake in some of the courses and distances called for, and my solution of the problem in two instances has been published. I refer to the cases of Davis v. Commonwealth Land & Lumber Co. (C. C.) 141 Fed. 740, and Taylor & Crate v. Breathitt Coal, Iron & Timber Co. (C. C.) 185 Fed. 854. In each of the three former instances my consideration was limited to the description contained in the patent. This is the first time that the terms of the entry have been urged upon me as having any bearing on the matter. It is in order, then, that I may place all my decisions on the same basis, that for the time being I dismiss the entry from all consideration. After I have reached a conclusion on this basis, the bearing of the description of the entry on the problem will be considered.

[1] What, then, are the different elements contained in the description of the 126,140-acre tract of land as set forth in the certificate and patent? As I make them out to be, they are as follows:

First. That the beginning corner of the tract is at a small beech.

tree standing on the edge of the North fork, which is itself 15 miles in a straight line from the mouth thereof, and the uppermost corner of the P. D. Roberts, Tarrason Bros. & Co. &c. land.

Second. That it contains 126,140 acres of land.

Third. That it has four sides.

Fourth. That it is slightly over twice as long as broad.

Fifth. That lengthwise it extends nearly north and south.

Sixth. That on its western side it binds on the P. D. Roberts, Tarrason Bros. & Co. &c. tract of land.

Seventh. That on its southern side it binds on the North fork.

Eighth. That the first, second, and third lines are straight, and the fourth as crooked as the North fork on which it binds.

Ninth. That the angles formed by the first and second lines and the second and third lines are right angles—so that at its northern or outer end it is rectangular.

Tenth. That if the fourth line from the fourth to the beginning corner were straight, it would be parallel to the second line, and that end also would be rectangular, and the whole tract form a rectangular parallelogram.

Eleventh. And that the courses and distances of the four lines are as set forth in the description.

I think there can be no question that the description under consideration contains each and all of these separate elements, and if it is possible to make a location fitting all of them it would have to be so made. Any other location would not be proper. But it cannot be so made. The description falls down at least as to the last element in part; i. e., at least in so far as the fourth line is concerned. None of the courses and distances of that line are correct. The reason for this is that the North fork, instead of ascending from the beginning corner nearly east, ascends first southeast for a short distance, then south for a much longer distance, and then again southeast. A location cannot, therefore, be made fitting any of the courses and distances so given. They have to be rejected from any location that is made. If a location could be made fitting the other ten elements, and all of the last one except such courses and distances, it would have to be so made—this on the idea that it is not proper to reject any more of the description than is absolutely essential to secure a location. But this is not possible. A location can be made by shortening the distance of the second line and lengthening that of the third, involving a modification of the fourth element, so as to make the length exceed the breadth to a greater extent, which otherwise fits all the elements of the description. Such a location can be made by ascending the North fork from the beginning corner to such a point that a line running N. 9° W. therefrom until it strikes a line running from the second corner S. 81° E. will include 126,140 acres of land. This will yield a four-sided body of land beginning at the small beech so marked, containing 126,140 acres, binding on the P. D. Roberts, Tarrason Bros. & Co. &c. tract of land and the North fork, all of the lines of which are straight except the fourth, and of the course called for, and whose outer end is rectangular in shape. This tract is the tract of the description save in

so far as the courses and distances of the fourth line, the distances of the second and third lines, and the comparative length and breadth of the tract are concerned. No other location can be made which conforms so well to the description. And it is of necessity that this location cannot conform thereto in these particulars.

It seems to me, therefore, that this is the correct location of the tract. It is in accordance with the main intent of the description of the certificate and patent. Of course, what is here said is subject to be controlled by the result of the consideration of the terms of the entry, when that comes to be taken up.

The location contended for by the intervening defendants cannot be accepted, because, though it runs counter to the elements of the description in no more particulars than the one I have held to be the true one, the particulars in which it runs counter thereto are more material. Each runs counter thereto in four particulars; the latter as to courses and distances of the fourth line, the distance of the second line, the distance of the third line, and the shape. It runs counter to it in the last particular merely in elongating or narrowing the tract. The former runs counter thereto as to the courses and distances of the fourth line, the distance of the second line, the course thereof, and the shape. It runs counter thereto in the last particular. in eliminating entirely its rectangular character at the northern or outer end. It is well settled in Kentucky that as between course and distance the former is to be preferred. In the case of Beckley v. Bryan, Ky. Dec. 91, it was said:

"When a departure from either course or distance becomes necessary, reason as well as law seems to suggest that the distance, taken in our mode of mensuration, ought to yield, as being much the more uncertain of the two."

And in Pearson v. Baker, 4 Dana (Ky.) 321, it was said:

"In general, distance yields to course, or, in the absence of any circumstance bringing the mind to a contrary conclusion, the courses shall be first pursued, contracting or extending the distance, as the case may require, to make the survey close."

That it is the thought of the description that the northern or outer end of the tract should be rectangular in shape appears, not only from its terms, but from the fact that when it was made, beyond question, the survey of the P. D. Roberts, Tarrason Bros. & Co. &c. tract of land was before the surveyor. According to it the northern or outer end thereof, and of each of the subdivisions thereof, and the inner end of each of the subdivisions, except those binding on the river, were rectangular in shape, and the sides were all N. 9° W. or S. 9° E. and N. 81° E. or S. 81° W. Clearly it was the intent of the surveyor to make the northern or outer end of the 126,140-acre tract conform in shape to the like ends of the other tract and its subdivisions alongside which it was placed. But such was not only the thought of the surveyor, the law preferred that shape. It required that in surveying entries they should be laid off in square or rectangular shape, unless there was something in the entry forbidding or inconsistent with it. In the Taylor & Crate Case, not then

knowing any better, I attributed the conception of the numerous rectangular parallelograms, of which the boundary involved therein was one, running across Buckhorn, to the surveyor. Their existence was due rather to this preference of the law. In the case of Massie v. Watts, 6 Cranch, 153, 3 L. Ed. 181, Mr. Justice Marshall, in referring to the matter of surveying entries, said:

"When a given quantity * * * is to be laid off on a given base, it shall be included within four lines, so that the line proceeding from the base shall be at right angles with it, and the line opposite the base shall be parallel to it, unless this form be repugnant to the entry."

Again he said:

"To the court it seems that the rectangular principle is always to be preserved; * * * that is, where there is no call in the entry applying to the lines which control them, and that where it is necessarily departed from, the departure should not be extended further than the necessity requires."

And again he said:

"The principle that the rectangular figure is to be preferred to any other, and is to be preserved whenever it can be preserved, originates in the necessity of adopting some regular figure, in order to give to locations that certainty which is not always to be found in their terms, and in the superior convenience of that figure over every other, with respect to the adjacent residuum."

The location contended for by intervening defendant is dominated by a desire to preserve the third line intact. And it should not be preserved at the expense of the course of the second line and the rectangular shape of the northern or outer end.

The fatal objection to the location contended for by the defendant company is that according to it either the tract does not bind on the North fork or it includes more than the acreage called for. As I understand its position, the rhomboidal parallelogram, formed as I have put it, contains the exact acreage contained in the rectangular parallelogram from which it has passed by dropping the third line in its plane to the North fork and extending the second and fourth sides. If so, the acreage between the fourth line of the parallelogram and the North fork is in addition to that contained therein, to wit, 126,140 acres. If, then, it limits its location to the parallelogram, it does not bind on the North fork, or if it includes the land between it and the North fork, so as to make it bind thereon, it covers more than 126,140 acres. Possibly I have misunderstood its position. If it is intended to be the same as put forth by the intervening defendants, it is subject to the criticisms already made of it.

But how does the solution of the problem here involved, which I have advanced, comport with the solutions advanced by me of the problems involved in the Davis and Taylor & Crate Cases? Are those two decisions consistent, and, if so, is the decision here consistent with them? I think that there is no conflict whatever between the two decisions. The controlling factor in each case was the thought of the description in the patent in question as to the shape of the tract. In the Davis Case the courses and distances given of the four sides in the description yielded a tract of land of a certain shape. It was the thought thereof, therefore, that the tract was of that shape.

A change in the course or distance, or both, of one line, would disturb the shape and run counter to that thought. In order, then, to preserve the shape and have the location in accordance with that thought, it was held that the same mistake in the course of one of the lines should be imparted to the opposite line, thus making the two opposite lines have the same relation to each other in the location that they had in the description, and thereby preserving the shape of the description in the location. In that case the description contained no other thought as to shape than that formed by the relation of the opposite lines to each other. In the Taylor & Crate Case such was not the case. Whilst the thought of the description therein was that the shape of the tract was that formed by the relation between the line of the creek and the outer line, such was not the whole thought of the description as to shape. It was also its thought that the outer end of the tract was rectangular, and this was the more material. If, then, the mistake in the creek line was imparted to the outer line in order to preserve the relation between the two, as in the Davis Case, violence would be done to the thought of the description that the outer end should be rectangular, and, as now appears, no consideration would be given to the preference of the law for such shape. The decision in that case was to no extent affected by the circumstance that there was another tract of land on the opposite side of the creek which, with the tract in question, formed a rectangular parallelogram. It would have been exactly the same had there been no such other tract.

Now the case we have here is the Taylor & Crate Case over again. For me not to hold as I have done would be to depart from my decision in that case.

[2] This brings me to consideration of the bearing, if any, of the entry on the question as to the location of the patent boundary and of its third corner. Seemingly it is the position of intervening defendants that it is controlling, and seemingly, further, it is because they so regard it, that they claim that the true location thereof is as heretofore stated. Indeed, it is not certain that if the entry were out of the case that they would contend for that location. The position that the entry has a bearing and is controlling is merely assumed. No authorities are cited which support it. Tennessee decisions are not in point, for the law of that state in this particular is different from what it is in Kentucky. In the case of Blunt v. Smith, 7 Wheat. 248, 5 L. Ed. 446, Mr. Chief Justice Marshall says:

"In Kentucky and in Virginia the rule is that a court of common law cannot look beyond the patent; but in Tennessee it is understood to be otherwise. The courts of law in that state allow the parties in an ejectment to go back to the original entry and to connect the patent with it. This rule is founded on the land laws of North Carolina, which has been construed in Tennessee to permit and require it. * * * The effect of entries, then, as well as their dates, is considered by the courts of Tennessee."

Nor are the Kentucky decisions, either by the Kentucky Court of Appeals, or by the Supreme Court of the United States in cases going there from Kentucky, involving the right of a patentee as to land west

of the Tennessee river under a patent based upon an entry made after December 26, 1820, in point. This is so because by a Kentucky statute (Laws 1820, c. 155) of that date it was provided that any such patent issuing on a survey made contrary to the entry should be void to all intents and purposes so far as the same might be different and variant therefrom. The case of Croghan v. Nelson, 3 How. 187, 11 L. Ed. 554, was a case of that sort. Nor are such Kentucky decisions in cases involving the right of a senior entryman as against a senior patentee in point. These decisions are very numerous and all of an early date. They are not in point because there the plaintiff's right was based solely on his entry. He claimed to be the equitable owner of the land covered thereby as against the holder of the legal title, and he sought in equity to compel the latter to convey such title to him. Of course, in such a case the question as to what the entry covers is the vital question therein, and if the patent conflicts therewith it must yield thereto. Here the intervening defendants' rights are based on their patent, and reliance is had on the entry pursuant to which it issued, to justify a location of the patent different from what I have held, without reference thereto, is the true location thereof. No decisions, so far as I have been able to make out, have been cited warranting such a use of the entry. Nor do I know of any. It is well settled that the certificate of survey and plat are pertinent to a determination of the location of the land covered by the patent. This, however, is for the purpose solely of correcting a mistake in transcribing the description of the certificate into the patent, and, so far as the plat accompanying the certificate is concerned, possibly, also, a mistake in transcribing the notes of the survey into the certificate. It was on this same principle, no doubt, that it was held in the case of Swan v. Wilson, 1 A. K. Marsh. (Ky.) 100, that the entry as well as the certificate was admissible in evidence to establish a mistake in the patent as to the name of the patentee. There is no transcription from the entry to the certificate as to the land covered by it. It is true that the entry defines the boundary. It would not be good if it did not. But the function of the survey to which the certificate relates is different. It indicates or points out the boundary so defined, so as to render it visible, and the certificate sets forth the visible boundary as disclosed by the survey.

If it be conceded that an entry ever has any bearing whatever on the location of the patent boundary, it certainly is not controlling. It can only be considered in construing the description of the certificate and patent, and only in case such description is ambiguous. If there is no ambiguity in such description, the entry cannot be used even to this limited extent; and there is no ambiguity in the description of the certificate and patent here. If one confines himself to the description set forth in the certificate and patent, there is no trouble. It is only when he goes beyond that, and comes to make it fit the ground, that trouble arises. It does not fit, and that not because of any ambiguity in the description, but because of the mistake of the surveyor as to the course of the North fork above the beginning corner. This mistake renders it impossible to fit the description as to all its elements. That it cannot be so fitted necessitates the rejection of such elements as will make

the description fit according to its main intent. It does not necessitate or permit of calling in the entry. The entry is no more pertinent than it would be if the description of the certificate and patent fit entirely, but varied from the entry. And even in case of a description that is in itself ambiguous there are circumstances which may weaken, if not destroy entirely, its effect in solving the ambiguity. I am not advised whether in the early days the entryman or the surveyor was the author of the terms of the entry. I have an idea that, even if the latter was, frequently the surveyor who made the survey was a different person from the one who made the entry. And even if the surveyor who made the survey and certificate were the same person who made the entry, so that in construing the certificate with the aid of the entry one would have before him two acts of the same person, and not acts of two different persons, the construction placed upon the entry would be in accordance with the rules laid down by the courts, which it is not unlikely would be different from the thought of the person who made the entry. Entries in the early days were very general in form, and one cannot read the decisions dealing with them without being struck with the great skill and ingenuity required to construe them aright. Inasmuch, then, as the description of the certificate and patent here is not ambiguous as to its meaning, the entry is not relevant, even if otherwise it might be.

These considerations relieve me of the necessity of considering the description in the entry, which intervening defendants rely on to support their contention as to the true location of the patent boundary. I do not think, however, that I should dispose of the case without taking notice thereof. The entry calls for 126,140 acres of land and describes it as follows, to wit:

"Beginning on the left-hand fork of the three forks of Kentucky at the end of 15 miles from the mouth of said fork when reduced to a straight line, it being the upper corner on the said fork of an entry made by P. D. Roberts, Tarrason Bros. & Co. &c. of 300,306⅔ acres; thence running from the said fork with their line to their corner; thence to extend from said corner parallel with a line that shall run up the meanders of said fork from the beginning when reduced to a straight line for quantity."

It is the call to extend from the second corner of the P. D. Roberts, Tarrason Bros. & Co. &c. entry, "parallel with a line that shall run up the meanders of said fork from the beginning when reduced to a straight line for quantity," that is relied on as not only justifying, but requiring, the location contended for by the intervening defendants. It is urged that it is inconsistent with this call for the northern or outer end to be rectangular in form. The rule as to the application of the rectangular principle is not that it should be applied in all cases; i. e., in disregard of the calls of the entry. It is only that it should be applied in the event there is nothing in the terms of the entry negativing or inconsistent with its application. The matter was thus put by Judge Boyle in the case of Carland v. Rowland, 3 Bibb, 125:

"The ordinary mode of surveying an entry with similar calls would require the lines to be run at right angles, those extending up the stream to be parallel to the general course thereof so far as it would be included in the survey, and those extending across the stream to be bisected thereby. But in

this case, owing to the peculiar and extraordinary bend of the creek, the rectangular figure cannot be preserved, and at the same time comply with the call to run up the creek on both sides; and as this is an express call, it must control the rectangular figure, that being a form given by construction only, where there is no express indication of the intention of the locator to give to the survey a different shape."

Judge Logan in the case of Calk v. Reed, 4 Bibb, 578, put it thus:

"It has never been held that the intention of a claimant as substantially expressed in his entry shall be sacrificed to the rules of construction and regular figures."

And in combatting the position that the rectangular principle should be applied in that case he said:

"All this by construction, opposed to the express calls of the entry and the obvious meaning of the locator, merely to preserve a taste for pretty figures."

Undoubtedly, then, if the call relied on was inconsistent with the application of the rectangular principle to the northern or outer end of the entry, it was not applicable thereto, and should have been disregarded in making the survey; the call of the entry being followed. I would note two things in this connection. One is that, though the surveyor in making the survey should not have applied the rectangular principle, yet if in fact he did apply it, in disregard of the calls of the entry, it is what he actually did and not what he should have done that governs in determining the location of the patent boundary. This is indirectly conceded by the intervening defendants. They so concede it because the location for which they contend departs from the entry in two important particulars, and here they do not claim otherwise than that it is the patent and not the entry which controls. One of these is as to the length of the first line and the location of the second corner. The entry calls to run from the beginning corner with the line of the P. D. Roberts, Tarrason Bros. & Co. &c. land to their corner. That line is 8,000 poles or 25 miles long, and its second corner is that distance from the beginning corner. The call of the certificate and patent is for a distance of 6,400 poles or 20 miles. The other particular in which the location for which they contend departs from the entry results from the foregoing departure. By reason thereof the third line of the entry extends the same distance further north of the third line of the location, and so that the second line of the location crosses it south of its northern end. This places the third line of the location east of the third line of the entry. All land, therefore, in the location between the third line of the entry and the second and third lines of the location is outside of the entry. It amounts to 22,140 acres, there being only 104,000 acres of the entry within the location. The location contended for departs, therefore, from the entry in these two important particulars, and it is not claimed that as to them the entry and not the patent should control. Even though, then, the surveyor departed from the entry in applying the rectangular principle to the entry, yet if in fact he did so depart, the patent and not the entry must control. That he did apply the rectangular principle to the northern or outer end of the survey is as certain as that he ran the first line 6,400 poles or 20 miles from the beginning corner, and locat-

ed the second corner at the end of that line instead of at the end of 8,000 poles or 25 miles, as called for in the entry. It is true that the one thought is not as directly expressed as the other is; but it is just as really disclosed by the courses and distances called for as to the first, second, and third lines. Why, then, should not the thought of the certificate and patent in this particular, if such is its thought, control as well as in the other, and as intervening defendants would have in the matter of including 22,140 acres outside of the entry according to their construction thereof?

The other thing that I would note is that, if the call to run the second line parallel with a line running up the meanders of the North fork from the beginning corner when reduced to a straight line was itself inapplicable, because of the extraordinary and unexpected change in the course of the North fork above the beginning corner, it was the duty of the surveyor to disregard it, and, it thus being out of the way, there was nothing left for him to do but to apply the rectangular principle in full force, just as much so as if there had been no inconsistent call. The necessities of this case do not require that I should hold that it was impossible to run a line from the second corner of the entry or of the survey parallel with a line from the beginning corner with the meanders of the North fork when reduced to a straight line. I would, however, have to be better versed in the learning as to surveying entries, which is quite extensive, than I am now before I could hold that it was possible to do so. I am aware that great liberality is to be exercised in giving effect to the word "parallel" in such connections. But it seems to me to be stretching things somewhat to say that this was a case where effect could have been given to it. The second line according to the call was to be parallel to a line running up the meanders of the fork from the beginning corner when reduced to a straight line. This contemplated that the straight line connecting the fourth corner with the beginning should bear relation to the general course of the river between the two points. It was for a line parallel to such a line that the entry called. Now it seems to me that, because of the change in the course of the North fork to which I have referred, it is rather out of the question to say that a line could be run from the second corner of the entry or survey parallel with such a straight line. Certainly until you ascend more than 20 or 25 miles above the beginning corner it is not possible to obtain such a straight line. Had the North fork continued to ascend in a southerly direction, instead of changing its ascent to an easterly and southeasterly direction, it would have been impossible to obtain a straight line following the general course of the North fork parallel to which a line could be drawn from the second corner of the survey or entry. In that contingency the whole of the North fork above the beginning corner, instead of the first 20 or 25 miles, would have been substantially in line with the first line. In the location contended for by the intervening defendants it is rather the third line than the second that is parallel to such a line. This is all that I feel called upon to say in regard to the entry. As it is, if I had nothing before me but the entry, I could not say that its

location should be held to be otherwise than what I have held the location of the survey as set forth in the certificate and patent to be.

I am therefore constrained to hold that, assuming the small beech marked "R. E. B." to have been at the point where a 15-mile straight line from the mouth of the North fork would strike it—i. e., the uppermost corner of the P. D. Roberts, Tarrason Bros. & Co. &c. tract—the 126,140-acre tract and its third corner are not located as contended for by either the intervening defendants or the defendant company, but as I have indicated they are, and that the 50,000-acre tract does not cover the land in contest.

But I am equally certain that that tree was not located at that point, but was located at the mouth of Cedar creek below the beginning corner, the lower corner of the E. Thompson subdivision of the P. D. Roberts, Tarrason Bros. & Co. &c. tract. It seems to me there is no escaping the force of the evidence that it was so located. It must be accepted that the witnesses Thruston and Sewell found a beech at that point marked as they testify on August 28, 1893. The account they give of themselves, as to who they are, and the fact that they are unimpeached, leaves no room to question their truthfulness and integrity. Their character, the circumstances under which they came to discover the tree, the pains taken to preserve the markings, and the detail given in regard to same, is convincing of the fact that this testimony is true. It must also be accepted that the tree which they so found was the tree marked by Surveyor Ellis and called for in his certificate and in the patent. The marks on the tree were of such a character as of themselves to establish that it was the tree so called for. Both Thruston and Sewell testified that in their opinion the letters "R. E. B." on the tree, constituting a part of the marks thereon, were as old as the certificate. This, however, is not all the evidence tending to establish this fact. We have the statement in effect of Lewis Marshall, another deputy surveyor under Thos. Marshall, made March 15, 1786, less than two years after the tree was marked by Ellis, that it was at that point. On June 16, 1784, three days before the entry of the 50,000-acre tract, George Pickett, Lewis Marshall, and George Marshall entered 70,000 acres, and it called to begin at the upper corner of the 126,140-acre tract on the North fork. Its calls are as follows:

"Beginning on the left-hand fork of the three forks of Kentucky river, at the upper corner of an entry of 126,140 acres made in the name of Jacob Weaver, John Phillips & Company, made April 22, 1784, and running thence up the said left-hand fork of Kentucky so far that shall make a line 3,000 poles, then at right angles from said Jacob Weaver & Company's entry, thence out from the river with a line parallel to Jacob Weaver & Company's entry, and with his line to the beginning shall include the quantity."

It has been justly said that the existence of this prior entry binding on the 126,140-acre tract and the North fork forced the location of the 50,000-acre entry off the river, if it was to be laid adjoining the 126,140-acre tract. If it had not been for this intervening entry, it is not at all unlikely that it would have been located as binding on the North fork. The fact that this entry of 70,000 acres, 3,000 poles

broad, intervened between the 50,000-acre entry and the North fork, of which the entryman of the latter tract no doubt was aware, indicates that in his thought the 50,000-acre tract was a good distance back from the North fork, so far that locating it on Licking river, where the location which I have made seems to place it, cannot be said to place it away from where he thought it would be if he gave it any reflection. On March 15, 1786, a tract of 23,160 acres was surveyed out of this entry, known as the "Pickett & Co. tract," and four days later, to wit, on March 19, 1786, another tract of 10,000 acres was surveyed thereout, known as the "John Hopkins tract," both surveys being made by Lewis Marshall, the deputy surveyor whose statement heretofore referred to I am about to set forth. These two tracts adjoin each other, the John Hopkins 10,000-acre tract lying north of the Pickett & Co. 23,160-acre tract. Each may be said to have been a four-sided tract of land. Their eastern lines were in the same plane and ran N. 9° W. or S. 9° E., the same as the courses of the side lines of the 126,140, 50,000, and 300,306⅔ acre tracts of land, and of the 22 subdivisions of the 300,306⅔-acre tract. Together they extended north and south a distance of possibly as much as 20 miles or over. The western and southern sides of the Pickett & Co. 23,160-acre tract bounded on the North fork, and of course were as crooked as it was. The line of the western side began at two sugar trees and a hackberry standing near the bank of the North fork 160 poles below the mouth of Troublesome, a tributary of the North fork, emptying into it from the same side on which that tract was located, which trees were the beginning corner of the survey—the point in the course of the North fork where they were located being a small distance above where the North fork in its ascent from the beginning corner of the P. D. Roberts, Tarrason Bros. & Co. &c. 300,306⅔-acre tract turned from a southeasterly direction to a southerly course—and extended therefrom to the point where the North fork in its ascent turned from a southerly to an easterly course. The southern line consisted of the North fork from that point to the point in its course from which the eastern line of the tract ran N. 9° W. Its ascent was east, then south, and then east. The northern line of the tract ran from the beginning corner N. 86° E. 730 poles, where it angled with the eastern line in its course from the North fork N. 9° W. This line of the Pickett & Co. 23,160-acre tract was the southern line of the John Hopkins 10,000-acre tract. The eastern line thereof, as heretofore stated, was an extension of the eastern line of the Pickett & Co. 23,160-acre tract. Its northern line was of the same course and distance as the southern line and parallel to it. This tract also began at the two sugar trees and the hackberry, the beginning corner of the Pickett & Co. 23,160-acre tract, and its western line ran therefrom down the North fork a distance of 70 poles, thence from the North fork N. 9° W. 240 poles to the North fork again, thence eight courses with the North fork, and thence N. 9° W. 1,320 poles, the course being in the same plane as the preceding course N. 9° W. to the point where it angled with the northern line. The western line, therefore, except where the course of the North fork formed a part of it, ran

N. 9° W. and parallel to the eastern line. In the certificate of survey the courses of N. 9° W. called for in the western line are said to bind on and run with the Jacob Weaver & Co. line; i. e., the eastern line of the 126,140-acre tract. The John Hopkins 10,000-acre survey was thus, except where the North fork constituted a portion of its western line, 730 poles broad. The Pickett & Co. 23,160-acre tract for a short distance from its northern end was of the same breadth, but from that point, owing to the North fork bending somewhat to the west, it was somewhat broader.

This much by way of description of these two tracts to introduce the statement of Lewis Marshall heretofore referred to. In the certificate of survey of the Pickett & Co. 23,160-acre tract and the John Hopkins 10,000-acre tract the beginning corner, to wit, the two sugar trees and hackberry standing near the North fork are said to be "3,148 poles above the upper corner of a survey made by Robert Armstrong for P. D. Roberts & Co." These two surveys thus made by Lewis Marshall were not office surveys. They were actual surveys. It is certain that he actually surveyed the North fork where it bounded the Pickett & Co. 23,160-acre tract on the west and south and the John Hopkins 10,000-acre tract in part on the south. This is so because he gives the courses and distances of those meanders of that stream, and as given they are substantially correct. It being an actual survey, it must be taken that he ran the line 3,148 poles from the upper corner of the Armstrong survey for P. D. Roberts & Co. The entry under which he was making the survey said that it began at the upper corner of the entry for the 126,140-acre tract, which was 3,148 poles from the uppermost corner of the Armstrong survey. The survey of that tract made July 8, 1784, did not call for any marked corner. It did not even call for imaginary timber. Ellis therefore in making the survey, did not mark the fourth corner, and it was not visible to the eye as a starting point when Lewis Marshall made his survey nearly two years later. The only possible way in which Lewis Marshall could find this corner, the beginning corner of his survey, was by measuring from the upper corner of the Armstrong survey of P. D. Roberts, Tarrason Bros. & Co. &c. 300,306⅔-acre tract up the North fork to a point where a straight line 3,148 poles therefrom would strike the North fork. To do this he would have to locate the upper corner of that tract. It was impossible to do so from any marked corner made by Armstrong. I do not understand that Armstrong marked that corner so as to make it visible. He called for two sugar trees at that corner, but there is not the slightest indication that he marked them. It is agreed that he did not meander the North fork on which the Ephraim Thompson 5,000-acre tract, the upper subdivision of the large one, bounded. The trees called for at the upper corner of this subdivision, also the upper corner of the tract, were then imaginary and not actual trees. If such was the case, the only possible way for Marshall to find this upper corner of the tract was either to run the 15-mile line from the mouth of the North fork or to accept Ellis' work as correct and take the small beech tree with the marks on, which were still fresh, as the up-

per corner. It is reasonable to suppose that he adopted the latter course. He had heavy work before him in surveying two tracts of land which he surveyed, and there was no reason whatever why he should lose time in doing over again what Ellis had already done so shortly before. It is not unlikely that before he went up into this country he talked with Ellis about the matter and was given directions to enable him to find the small beech so marked with the least difficulty.

The beginning corner of the Pickett & Co. 23,160-acre tract and the John Hopkins 10,000-acre tract is known. It is at a point 160 poles below the mouth of Troublesome creek on the bank of the North fork. It is possible that some of the trees called for by Marshall are still standing. At any rate, that is the undisputed corner of those tracts. Now the distance from that corner to the point where Thruston and Sewell locate the small beech marked "R. E. B." is substantially 3,148 poles. I am not absolutely sure as to this. But this is what I make out of the evidence relating thereto. The distance should have been actually measured, so as to know it accurately. The statement of Marshall in his certificates of these two surveys that the beginning corner thereof was 3,148 poles above the upper corner of the Robert Armstrong survey of the P. D. Roberts & Co. tract of land was therefore in effect a statement that the small beech marked "R. E. B." was at the point where the tree so marked was found by Thruston and Sewell. In measuring the line it is likely that Marshall discovered its course and that it was not N. 81° E. or S. 81° W. according to Ellis' survey, though in his certificate he did not give its course. If so, he took it no doubt that Ellis had made a mistake, and it is to be noted that he does not undertake to give its course. Had he begun at the true corner of the Armstrong survey of the P. D. Roberts & Co. tract, several miles above the small beech, and run 3,-148 poles therefrom in a straight line substantially with the meanders of the North fork, he could not possibly have surveyed the two tracts which he surveyed as he did, if, indeed, he would not have been so puzzled as to how to make the surveys as to abandon the effort to do so. It so happened that the point where the 3,148-pole line from the small beech, taking it to be where Thruston and Sewell locate it, ran out was about the last point to which he could have gone and confined the North fork to being the southern boundary only of the 126,140-acre tract.

Lewis Marshall thus located these two tracts on the basis that the small beech marked "R. E. B." was at the point where the beech so marked was found by Thruston and Sewell, and that that was the upper corner of the Robert Armstrong survey of the P. D. Roberts & Co. tract. Besides, in the same year, to wit, 1786, he located 12 other tracts depending on the location of the Pickett & Co. and Hopkins tracts on the same basis, to wit, the Rice, Gill, Hill, and Coleman tracts on Quicksand, or South Quicksand, and the four Cogswell; two Weakley, and McClardy and Burge tracts on South Quicksand or Troublesome. Of course, the weak point in the argument here is that Marshall did not state that the small beech which Ellis had so

marked was down the North fork from the beginning corner of the two tracts so surveyed by him at a distance of 3,148 poles therefrom, but that the upper corner of the Robert Armstrong survey of the P. D. Roberts & Co. tract was down the North fork from that corner at that distance. But as it was not possible for him to have truthfully made the latter statement, except on the basis that he took the small beech so marked to be that corner, and, according to the testimony of Thruston and Sewell a small beech so marked was in fact at that distance from his beginning corner, it seems to me reasonable to take his statement as amounting in effect to a statement that the small beech was at that distance therefrom. He could not have made the statement except on that basis, because the real corner of that tract was not at the distance of 3,148 poles from his beginning. It lacked several miles from being that distance therefrom.

[3] It is urged that this statement is inadmissible in evidence, and numerous authorities are cited to support this position. I do not deem it best to criticise the authorities so cited but to deal with the question directly in my own way. It is to be borne in mind that the evidence is not relied on to dislocate the P. D. Roberts, Tarrason Bros. & Co. &c. tract of land, by placing its upper corner several miles down the North fork from where it really is. It is relied on solely to show where the small beech marked "R. E. B." by Ellis and taken by him to be that corner was. The question in hand belongs to the subject of the admissibility of extrajudicial declarations of deceased persons as to the location of private boundaries. This subject is dealt with in 4 Chamberlayne on Evidence, §§ 2804 to 2810, inclusive. He notes that in England and Canada such evidence is held to be inadmissible. In section 2804a he says:

"In no connection, perhaps, is the forensic necessity of the proponent for the admission of such evidence so great as where the boundary or landmark is an ancient one. It may be and often is difficult to obtain relevant evidence as to the location of private boundaries other than the unsworn statements of deceased persons familiar with the facts. Should the line be an ancient one—i. e., established for over thirty years—judicial administration may well be justified, in the absence of evidence to the contrary, in assuming that securing other evidence on the point is beyond the power of the proponent. Such is the rule of practice or precedure relative to other ancient facts."

Then in section 2806 he says:

"A distinct step forward has, moreover, been taken in many jurisdictions of the United States. The peculiar circumstances attending the settlement of a new country have made it natural, if not inevitable, for judicial administration in those jurisdictions * * * to receive, by reason of the necessity of the case, the proponent being unable to produce other evidence in support of his contention, unsworn statements as to the position of private boundaries in general, their corners, or their landmarks, if made by deceased persons of adequate knowledge."

In section 2808 he says:

"The circumstance that a declaration regarding private boundaries was a spontaneous one, rather than made as the result of reflection, would undoubtedly add in many instances to its probative force."

By "spontaneous" he means as a part of the res gestæ. And finally in section 2810 he says:

"The propriety of the rulings given elsewhere to the effect that the extrajudicial statements of deceased persons with regard to the position and marks of private boundaries may be received under the present exception to the hearsay rule as secondary evidence of the facts asserted has by no means been acknowledged in all jurisdictions of the United States. In several highly respected courts proof of this nature has been rejected."

One of the courts to which he thus referred is that of Kentucky, and he cited in support of this statement the case of Cherry v. Boyd, Litt. Sel. Cas. 7. This case was a decision, not of the Court of Appeals of Kentucky, but of the Lexington district court, made in the year 1800, and not reported until 1824. It was there held that the declaration of a surveyor who was dead as to the lines appearing on the land in dispute was inadmissible in evidence.

As to the rule in federal courts Mr. Chamberlayne has this to say in note 8 to section 2806:

"Federal courts follow the practice prevailing in the jurisdiction within or for which they are sitting, so far as relates to the reception of extrajudicial statements by deceased persons as to the lines or landmarks of private boundaries."

He then cites the case of Ellicott v. Pearl, 10 Pet. 412, 9 L. Ed. 475, a case that went to the Supreme Court from Kentucky, as "rejecting declarations in accordance with the Kentucky rule." He then continues in these words:

"Should a case occur where the federal court would be at liberty to exercise its independent judgment on this subject, it seems probable that the court would prefer the rule admitting extrajudicial declarations to prove the boundaries of private persons."

In support of this he cites Clement v. Packer, 125 U. S. 309, 8 Sup. Ct. 907, 31 L. Ed. 721; Ayers v. Watson, 137 U. S. 584, 11 Sup. Ct. 201, 34 L. Ed. 803. In these two cases, however, the Supreme Court followed the state rule, the first one going there from Pennsylvania and the other from Texas, and they are cited along with Ellicott v. Pearl in support of the proposition to which it relates. It is because the opinions in those two cases indicate that the Supreme Court favored the rule which it upheld therein that he felt warranted in saying that in the absence of any state rule that court would take the same position.

In the case of Clement v. Packer, Mr. Justice Lamar had this to say as to the case of Ellicott v. Pearl:

"The case of Ellicott v. Pearl, supra, was brought to this court by a writ of error in the Circuit Court of the United States for the District of Kentucky, and in the decision here this court adhered to the English rule, and rejected the evidence of the declaration of a deceased surveyor as to the boundary of a private estate. In so doing this court was simply enforcing the rule as it existed in Kentucky at that time. In Cherry v. Boyd, Litt. Sel. Cas. 8, decided by the Supreme Court of that state in 1800, it was held that evidence of the parol declarations of a surveyor concerning the marks or lines of a private estate were inadmissible. This being the settled law of Kentucky, this court could not have decided otherwise than it did in Ellicott v. Pearl. But even in that case the court uses the following guarded lan-

guage: 'The doctrine in America, in respect to boundaries, has gone further, and has admitted of general reputation * * * between contiguous private estates.' "

In a hasty reading of Mr. Justice Story's opinion in the case of Ellicott v. Pearl, I fail to find any reference to the case of Cherry v. Boyd. It may be there, but it has escaped me. He seems to have decided the question as one of general law. That Mr. Justice Lamar in Clement v. Packer attributed the decision to Cherry v. Boyd, may be one indication that he favored the rule as to the admissibility of such declarations.

The matter then comes to what is the rule in Kentucky on the subject. I do not think that the rule laid down in Cherry v. Boyd is now the law in Kentucky. This is the third case in Littell's Select Cases which I have found to be out of line with the position of the Kentucky Court of Appeals. I referred to one of the two others in the case of Davis v. Commonwealth Land & Lumber Co. (C C.) 141 Fed. 740, 765, and to the other in In re Watson, 201 Fed. 962, 977. This position I justify by the following cases, to wit: Ewing v. Savary, 3 Bibb (Ky) 235; Smith v. Nowells, 2 Litt. (Ky.) 159; Smith v. Cornett (Ky.) 38 S. W. 689. The case of Ewing v. Savary was substantially like the case here. There the question was whether a junior certificate of survey was admissible in evidence to prove the boundaries of the senior. Judge Logan said:

"Where a survey calls for lines or corners of a prior survey, as such prior survey in that case composes a part of the description of the subsequent survey, it would unquestionably be proper evidence; but the subsequent survey can in no case constitute any part of the description of the prior one."

It is not contended that the Marshall surveys constitute any part of the Ellis or Armstrong surveys, and hence so much of Judge Logan's opinion is not pertinent here. But he does not stop with this remark. He continues as follows:

"It can at most amount to but a declaration of the surveyor who made it of the position of the boundaries of the prior survey, and ought to be received as evidence only under circumstances which would render hearsay evidence admissible. General reputation is perhaps in all cases, hearsay is in some cases, admissible evidence in relation to the subject of boundaries, because from its nature it does not admit of more direct and positive proof; but the clear result from all the cases with respect to the admission of hearsay evidence is that proof of what any particular person has said cannot be admitted, unless it appears that such person is absent from the country, or dead, or otherwise incapable of giving evidence in the cause. And as this was not proven to be the case with respect to the surveyor who made the surveys offered in evidence in this instance, the certificates of survey were inadmissible."

This was a clear recognition of the position that if the surveyor had been dead the certificates would have been admissible.

In Smith v. Nowells, it was said:

"The first point proper to be noticed is as to the admissibility of the evidence of the reputed boundaries of Barbour's survey. That the evidence was properly admitted we think there can be but little room to doubt. What any one, even a person who had been at the making of the survey, had been heard to say, would no doubt be inadmissible, unless the death of such person

was first proved; but there is a difference between hearsay of a particular fact and general reputation. From the nature of the thing an old boundary cannot, in general, be proved by direct and positive proof; and reputation is, therefore, from necessity admissible."

Here again there is a clear recognition that a declaration of a deceased person who had been at the making of a survey is admissible in evidence as to the location of the boundaries called for therein.

And in the case of Smith v. Cornett Judge Guffy said:

"It was error to allow witnesses to testify as to statements made to them as to the location of lines or corners by persons who were still living. It is true that hearsay testimony as to the location of corners to land may be admitted when the parties making the statement which it is desired to be proven are dead, but that rule cannot be extended to statements made by persons still living. Such persons should be introduced to prove the fact themselves."

Here it is expressly stated that such statements of deceased persons are admissible in evidence. It is true that recognition and statement of the rule in these three cases is obiter, but they are sufficient to justify me in accepting them as putting forth the law of Kentucky on this subject rather than the case of Cherry v. Boyd, notwithstanding the question was there directly involved. I have considered all Kentucky cases cited on behalf of intervening defendants, and none are in point except Ewing v. Savary, and that is against their position. In this case we have a boundary over 125 years old; the declaration was in writing, was a part of the res gestæ, was made in the course of the performance of official duty, and 14 different surveys were built upon its correctness. I have no doubt, then, as to the admissibility of the evidence, and believe it to be evidence of a very high character. In connection with the testimony of Thruston and Sewell as to their finding a beech tree so marked at a point substantially 3,148 poles down the North fork from the beginning corner of the two Marshall surveys, no other conclusion can be drawn than such tree was the tree marked by Ellis as the beginning corner of his survey of the 126,140-acre tract.

But this is not all in the evidence tending in this same direction. Between the beech tree so marked, found by Thruston and Sewell, and the beginning corner of the two Marshall surveys, two large streams empty themselves into the North fork from the side thereof on which the 126,140-acre tract is located, to wit, Frozen and Quicksand. On the plat accompanying the certificate of survey made by Ellis of the 126,140-acre tract, two streams are shown so emptying into the North fork. It is because of this circumstance that I have heretofore said that Ellis, in addition to marking this beginning corner, may have ascended the North fork at least as far as Quicksand. Of course, if by the two streams on the plat he intended to represent Frozen and Quicksand, he must have done so.

Then the facts set forth in the opinion in the case of Cockrell v. McQuinn, 4 T. B. Mon. (Ky.) 61, decided January 16, 1827, and which involved the location of the southern line of the Reynolds 126,140-acre tract, tend very strongly to indicate that when that case was tried in the lower court, which may have been years before, the small

beech marked "R. E. B.," located as Thruston and Sewell place it, and the two sugar trees and hackberry, the beginning corner of the two Marshall surveys, which it is agreed were 160 poles below the mouth of Troublesome, were accepted as the beginning corner and fourth corners of the 126,140-acre tract on the North fork. The sole question considered and determined in that case was as to the correctness of an instruction given to the jury by the lower court in these words, to wit:

"That the calls in the patent, 'thence from the fourth corner down the river these several courses,' should be construed by the jury as a call to run down the river, binding thereon with the meanders to the beginning, and that the fourth boundary line of the Reynolds survey was the said North fork of Kentucky."

In other words, it was whether the North fork was the southern line of the tract. It was held that the instruction was correct, that such was the southern line of the tract, and that the call for courses and distances should be rejected. There was no dispute as to the location of the beginning and fourth corners. They were treated as well known. Judge Owsley said:

"There was no controversy between the parties as to the beginning or the fourth corner described in the patent. The beginning was proved to be on the north side of the North fork of Kentucky, and the jury were instructed by the court that the fourth corner was at that point on the same side of the fork where, pursuing the course of the third line from the third corner, it would strike the fork, and that instruction was acquiesced in by both parties."

And again he said:

"It should be remarked that no attempt was made on the trial to prove any marked lines or any course between the fourth corner on the North fork and the beginning corner of Reynolds, though it was proved that, instead of following the course of the fork, the courses and distances called for between those corners would cross the fork."

It is to be noted that it was said that it was proved that the beginning corner was on the north side of the North fork, and not said where it was proved that the fourth corner was. It is only said that the jury were told that it was at that point on the same side of the fork where, pursuing the course of the third line from the third corner, it would strike the fork. But there must have been some evidence as to where such a line struck the fork, else it was not possible for the jury to determine where the fourth corner on the fork was. And where is it to be taken that the evidence disclosed that it struck the fork? It is inconceivable that it disclosed that it struck it 55 miles above the beginning corner as claimed by intervening defendants, or even where I have held that it struck it. Had the evidence disclosed this, it certainly would have cropped out in the opinion.

The parties to that litigation, their attorneys, the jury, and the courts, lower and higher, were in blissful ignorance of the problem we have here. There was but one other place for the evidence to have disclosed as being struck by such a line, and that place was the beginning corner of the two Marshall surveys. The John Hopkins 10,-000-acre tract, called to bind on that line and that corner, was said in

the certificates for those surveys and the patents issued on them to be 3,148 poles from the upper corner of the Armstrong survey of the P. D. Roberts tract, the beginning corner of the 126,140-acre tract. And it is significant that it is said that following the course of the fork the courses and distances called for between those corners would cross the fork, which is what they would do taking the fourth corner as being at the beginning corner of the two Marshall surveys. It is not unlikely that the matter was put in this general form because the 126,140-acre survey called for no timber or other visible corner, and the corner of the two Marshall surveys was not a corner of that survey. If, then, that was the place where the fourth corner was disclosed by the evidence to be, where was it proved that the beginning corner was? It must have been at the small beech then plainly marked "R. E. B.," which was at a distance substantially 3,148 poles down the fork from that place. And it is not without some significance that amongst the marks found on the beech by Thruston and Sewell were the letters "J. R." and "W. S.," the latter under the former and both above the letters "R. E. B." and also the letters "I. A. S. A." below them, and below these letters the date "August 13, 1813." All these letters and this date are testified to have been about the same age. It is not unlikely that the letters "J. R." were intended for the initials of the patentee, James Reynolds, and "W. S." for the initials of the surveyor who made a survey of the North fork line of the 126,-140-acre tract on August 13, 1813, possibly William Sudduth, said to be a surveyor in those days. No other explanation of the other letters has been suggested, and none occurs to me. And it is not unlikely that the survey thus noted on the tree was made in connection with the case of Cockrell v. McQuinn.

There was a circumstance that was likely to cause Ellis, the surveyor, to make the blunder which he made if the small beech so called for by him was located at the point where the beech discovered by Thruston and Sewell was located. That circumstance was that that point is just 15 miles in a straight line from the mouth of the South fork of Kentucky. In running this line then it is possible that Ellis began at the mouth of the South fork, instead of the mouth of the North fork, which is incorrectly shown on the Armstrong map as being directly nort of the mouth of the South fork. Then, again, the timber called for at the upper corner of the Armstrong survey is two sugar trees. The same timber is called for as the corner between the Ephraim Thompson and P. D. Roberts subdivision on the North fork, along with a bounden ash. It seems to be agreed that Armstrong did not survey the North fork above this point. If so, the two sugar trees called for at the upper corner of the whole survey may have been imaginary, and the two called for as the corner on the fork between these two subdivisions actual and marked.

Then there was a circumstance which, if Ellis did make the blunder, was calculated to make him think that the general course of the North fork above the beginning corner of his survey was as he has shown it in the courses and distances called for on his plat. This was that the North fork above where Thruston and Sewell found the beech

tree runs in that general course for some distance, possibly as much as a mile or two. The suggestion here made may possibly conflict with the suggestion heretofore made that Ellis may have gone up the fork at the time of his survey as high as Quicksand. But it is not possible at this late date to make everything fit exactly.

What, then, is there in the case against the position that Ellis made the blunder and began his survey at the point where Thruston and Sewell found the beech. It is that within the recollection of persons now living that point has not been known as the upper corner of the P. D. Roberts, Tarrason Bros. & Co. &c. 300,306⅔-acre tract and the beginning corner of the Reynolds 126,140-acre tract, and that general reputation locates that upper corner at the place up the fork where it rightfully is. I am not sure whether the general reputation now is that such is the beginning corner of the 126,140-acre tract. As I recall, the evidence does not disclose whether there is any general reputation now as to either of the corners on the fork of this tract, or that any one is now claiming under that patent who would look to its calls for the location of its boundaries. I will assume, however, that such is the reputed beginning corner of the 126,140-acre tract also. But this circumstance is not inconsistent with the position that Ellis made the beginning corner at the beech where Thruston and Sewell found it. It simply indicates that, in the long time that has elapsed since the Cockrell v. McQuinn Case, the true corner was ascertained and the claim that that beech was the corner was abandoned and unknown to any one until found by Thruston and Sewell.

If, then, Ellis did begin his survey at that beech, the boundary covered by the patent issued to Reynolds began there also, notwithstanding it was a blunder and thereby the Reynolds tract was made to lap considerably on the P. D. Roberts, Tarrason Bros. & Co. &c. tract, and in determining the location of the third corner thereof, which fixes the beginning corner and location of the 50,000-acre tract, such must be taken as the beginning corner of the 126,140-acre tract. But in determining such location, taking that as the beginning corner, the work of Lewis Marshall has no bearing whatever. His conception as to the true location of the 126,140-acre tract must be put out of the case entirely.

The fact that Ellis began his survey at the beech simply changes the beginning corner of the tract from what it is claimed to be by the intervening defendants. It leaves with us the same problem as to the true location of the 126,140-acre tract that was before us on the assumption that its beginning corner was where it should have been, and it in no wise affects the question as to how that problem should be solved. I am not advised whether, if it should be solved as intervening defendants claim it should be, the 50,000-acre tract would conflict to any extent with the Reid patent. If it does not, then, of course, the mere change in the location of the beginning corner defeats their claim. It is only in case that, with a change in the beginning corner, there is still a conflict that the problem as to the true location of the 126,140-acre tract and its third corner calls for solution. Assuming that there is still a conflict, I think that the location there-

of should be made along the lines heretofore suggested, though with a change in the beginning corner a location according to intervening defendants' position will cause the northern or outer line of the tract to be more in parallel relation with the southern or North fork line than in case the beginning corner is as they claim it to be.

The conclusion of the whole matter is that I think the cross-bill of the intervening defendants should be dismissed.

This brings me to the contest between the two companies, the original parties to the suit. The sole question here is as to whether the defendant company has acquired by adverse possession the title of the plaintiff to the land in dispute between them. If not, the plaintiff is entitled to a decree, as that land is covered by the Reid patent, under which it claims and with which it has connected itself. The burden is on the defendant to establish that it has. To appreciate and properly dispose of the question involved it is well to visualize, as it were, that land.

The Reid patent covers a boundary containing 154,800 acres, from which it excludes 25,800 acres of "patented and otherwise appropriated land"; i. e., land previously "patented and otherwise appropriated." The land to which the plaintiff in its bill asserts title under this patent is so much of a certain boundary of land therein set forth, containing 4,717.4 acres, as is within the boundary of the Reid patent, excluding therefrom 14 smaller boundaries which had been previously patented—one to Jesse Rogers and Isaac Shipley, containing 50 acres, patented January 14, 1823; three to Jonathan Fugate, one of which, containing 50 acres, was patented to him May 20, 1823, and the other two, containing, respectively, 50 acres and ——— acres, August 25, 1841; four to Jesse Fugate, one of which, containing 50 acres, was patented to him June 2, 1848, and the other three, containing, respectively, 50 acres, 25 acres, and 25 acres, April 21, 1860; one to John Fugate, containing 50 acres, patented to him April 21, 1860; and five to Henry Williams, containing, respectively, 50 acres, 100 acres, 50 acres, 50 acres, and 200 acres, alleged to have been patented to him prior to June 15, 1872, but some of which were patented afterwards. It is possible, also, that there was a mistake made in alleging that two parcels were patented to Jonathan Fugate August 25, 1841. The bill alleges that the defendant company claims title thereto. The defendant company in its answer asserts title to the whole of the boundary of 4,717.4 acres of land; but, as the plaintiff only claims so much thereof as is within the Reid patent, excluding that previously patented or otherwise appropriated, the dispute between them relates only thereto.

The only title which the defendant company asserts to the entire boundary is by adverse possession. As stated at the outset of this opinion, the land in dispute is located on South Quicksand. This stream runs in a westerly direction and empties into Quicksand not far from where it empties into the North fork. The boundary of the 4,717.4 acres is up towards the head of South Quicksand and extends along it for a distance of about five miles. At the lower and upper ends the stream runs through it, whereas in the center it is located

almost entirely on the north side; the lower portion thereof not binding thereon, and the uppermost running with it mainly on the southern side. Where the stream runs through it the land extends to the top of the ridge on both sides, and where it is on the north side it extends to the ridge on that side, except where it does not bind thereon. It is the lower end of this boundary that is not within the Reid patent, and is all thereof lying northwest of a line, the closing of the Reid patent, running N. 55° E. from its beginning corner at the mouth of Troublesome. That portion thereof which is within the boundary of the Reid patent extends along South Quicksand nearly four miles. The streams emptying into it from the lower end—i. e., the lower end of so much as is within the Reid patent—to the upper end are as follows, to wit: Lick branch, from the north or left as you ascend; Gunwale hollow, from the south or right as you ascend; Open fork, from the north; Cane and Lick branches, from the south; Hickory and John Noble branches, from the north; Ten acre, Spicewood, and Sanford branches, from the south; Jim's branch, from the north; Spring branch, Cannel Coal hollow, and Old Cove branch from the south; Cane branch, Rabbit hollow, and Laurel fork from the north; and Deadening Bottom branch and Two Mile from the south. Just below the boundary of the Reid patent and within it two important streams empty into South Quicksand from the south, not far apart, to wit, Fugate's fork and Leatherwood, and between them and the boundary of the Reid patent Stacey's branch empties into it from the north. The important streams emptying into South Quicksand from the south are Spicewood and Two Mile, and from the north Open fork, Hickory Log branch, Jim's branch, and Laurel fork. It is at Open fork that the boundary lies wholly to the north of Quicksand, and between it and Hickory Log branch it crosses to the south side, and from that point to just below Jim's branch runs with South Quicksand, mainly on the south side.

The boundary claimed by the defendant, the portion whereof claimed by plaintiff under the Reid patent has been set forth, first came into existence April 30, 1888, or shortly prior thereto. It was on that date conveyed by Charles H. Stoll to the Kentucky Union Land Company. Theretofore, to wit, in the year 1887, he had obtained eight separate deeds from certain individuals claiming separate portions of the land within that boundary. The several deeds set forth the boundaries claimed by them, respectively, and cover possibly only four separate boundaries, known as the Henry Williams, Jesse Fugate, John Fugate, and John Clemons boundaries, coming in this order as you ascend the creek. Without having examined the matter closely, I take it that these separate boundaries cover the whole of the land within the boundary of the 4,717.4 acres. Before making his deed to the Kentucky Union Company, Stoll caused the outside boundary of those several tracts to be surveyed and marked, and he conveyed the whole of the land as one tract by this boundary. In the year 1891 suit was brought in the United States Circuit Court for the District of Kentucky to wind up the affairs of the Kentucky Union Land Company. In that suit a receiver was appointed to take charge of the assets of the com-

pany pending the litigation, and subsequently thereto those assets were sold therein, and the defendant company became the purchaser thereof, including the boundary on South Quicksand, and on the 30th day· of July, 1896, it was conveyed to it by the commissioner of that court and it has claimed it ever since. It is this boundary which is set forth in the bill as covering the land claimed by plaintiff.

This suit was brought September 18, 1906, so that from April 30, 1888, down to that date, a period of over 18 years, the Kentucky Union Land Company and defendant have continuously claimed the whole of that boundary. It is a well-defined and well-marked boundary, and has been so during all that time. These two companies have, successively, not only claimed the title to the whole of this boundary, but they have also claimed to be in the actual possession of it. During the whole of the time they have continuously had tenants living within the boundary. It has been looked after on their behalf, first by George W. Miller, and then upon his death by his son, John Miller.

In 1892, after the bringing of the suit referred to and the appointment of the receiver, one W. E. Gunn entered on the land under patents recently obtained by him and others, and built two houses on the north side of South Quicksand, one at the lower end, at the mouth of Stacey's branch, outside of the boundary of the Reid patent, and the other at the mouth of Jim's branch, within it, and toward the upper end. Proceedings for contempt were instituted against him in that court, and he was adjudged guilty and fined $500. These proceedings were bottomed on the fact that the receiver was in the actual possession of this boundary and Gunn had invaded his possession. That was the sole question involved. The rule against Gunn was to show cause why he should not be compelled to surrender to the receiver the possession of certain land in Breathitt county, lying on the waters of Quicksand creek, containing 4,717 acres, and why he should not be punished for contempt of court for interfering with the receiver's possession of said tract of land. Gunn, in response to the rule, denied that the receiver was in the actual possession of any of the land covered by the patents under which he entered. Evidence was heard, and it being held that the receiver was in the actual possession thereof, the result was as stated. Gunn was further ordered to surrender possession of the two houses in which he had placed tenants to the receiver, which he did. Judge Barr in his written opinion said:

"The issue thus made is one of possession, and the title to this land need not be considered, except as it may affect the question of possession."

The position was taken that Stoll's vendors had entered under patents, the boundaries of which were the extent then of their claims, and that as the improvements were made within the patent boundaries they could not acquire possession outside thereof by merely surveying and marking a boundary and claiming to the extent of the boundary thus marked. To this Judge Barr said:

"We think this contention cannot be sustained, either by the facts proven or the law applicable to the facts as proven. The evidence proves that many of the improvements made by the vendors of Stoll, or those under whom they claim, are outside of the boundaries of any of the patents issued to them, as

shown on the map; and some of these improvements are partly outside and partly inside of those patents. Only a few of these improvements are entirely within the boundaries of those patents. This clearly proves that it was not the intention of the parties to confine their claim to the boundaries of the patents. The extent of the claim of the vendors of Stoll prior to 1887 is only material on this rule to show that prior to the conveyances to Stoll they had not confined their claim and possession to the boundaries of the patents, and thus meet the contention that they could not and did not have possession beyond those patent boundaries. It is not necessary to consider the precise extent of these claims and possession for years prior to the conveyances to Stoll, since the evidence is uncontradicted that the lands conveyed to Stoll had been previously marked by clear and distinct boundaries. Whether those marks were old or recent is not material, since the intention to claim to the extent of those boundaries and deliver the same to Stoll is manifest. It is equally manifest that Stoll received the conveyances and the possession from his vendors to the extent of the boundaries described in the conveyances, both inside and outside of the patents, unless there is some rule of law which confined him to the patent lines or the actual inclosures outside of them. We think there is no rule of law that confined those vendors to the patent boundaries or their actual inclosures outside of those boundaries. In Campbell v. Thomas, 9 B. Mon. [Ky.] 83, the court says: 'The land was vacant in 1816, when originally settled on by the individual under whom the defendant claims. Having surveyed and laid off 170 acres, and entered and settled upon it, with the intention of taking possession of the whole, he gained, according to the repeated adjudication of this court in similar cases, where the entry was made under color of title, a possession to the extent of his marked boundary.' In that case the entry was made without title, but claiming a surveyed and marked boundary, and the contest was between such a possessory title and a patent from the state in 1823. See, also, Thomas v. Harrow, 4 Bibb [Ky.] 563; Farmer v. Lyons, 87 Ky. 422 [9 S. W. 248]."

It was thus solemnly adjudged after full hearing that at the time of Gunn's entry the receiver, on behalf of the Kentucky Union Land Company, was in the actual possession of the whole boundary of 4,717 acres, and it and the receiver had been in such possession ever since the deed to Stoll. There can be no question that if this adjudication was correct the receiver and defendant company have been in the actual possession ever since.

Furthermore, the claim of ownership and actual possession on the behalf of the Kentucky Union Land Company, its receiver, and the defendant company since April 30, 1888, has been a notorious one. This contempt proceeding was calculated to give it great notoriety. The deeds to Stoll, by Stoll to the Kentucky Union Land Company, and by the special commissioner on behalf of that company to defendant, were put to record shortly after their execution and delivery. The sale at which defendant company purchased was at public auction at the courthouse door at Jackson, the county seat of Breathitt county, after notice thereof in the newspapers there published. These several parties have regularly assessed this whole boundary for taxation and paid the taxes on it. There is almost a continuous series of inclosed fields in the bottoms along the course of the creek, and there are several houses on it. During all this time the defendant company and its predecessor in title and its receiver have had tenants living within these houses and cultivating those fields, and an agent overseeing and looking after the land. The county road runs up the creek alongside these fields. It was generally known during all this time that the de-

fendant and its predecessor claimed to have and to be in possession of the whole of this land.

Notwithstanding this, it is claimed by the plaintiff that the defendant company and its predecessor in title and its receiver never have had actual possession of any portion of this boundary of land beyond the boundaries of the patented and otherwise appropriated land expressly excluded by the Reid patent from its operation and the extent of such small inclosures as there may be beyond those boundaries. It concedes that, in addition to the previously patented boundaries mentioned in the bill heretofore referred to, there had also been previously patented to William Collins a tract of 50 acres August 25, 1841; to John Clemons three tracts, one of 50 acres, December 29, 1852, one of 50 acres August 8, 1868, and the other of 100 acres August 8, 1868, and one to Daniel Duff of 50 acres on June 23, 1847, all of which tracts were along the creek at the upper end of the tract. It claims the patents mentioned in the bill and these additional ones are located mainly along the creek, and that such of them as are so located form one continuous body extending from the lower to the upper end of the boundary of the 4,717 acres, and substantially cover all the inclosures on that tract, and that such possession as the defendant company and its predecessor in title and its receiver have had of that boundary has been confined to such of the boundaries of them as are within it and to such inclosures as extend beyond those boundaries.

It is certain that, as the plaintiff was no party to the contempt proceedings heretofore referred to, the finding and judgment therein is not only not binding upon it, but is not evidence against it. The question here involved is an open one, as much so as if there had been no such proceedings. It has been referred to as showing the extent of the claim which defendant is asserting, and its notoriety, and as negativing that any inclosure beyond the boundaries of the senior patents, no matter how small was clandestine or due to a mistake.

[4] A few general observations on the subject of possession of land is another particular of approach to the questions in hand that will aid in its solution. There is no such thing as possession of land save in connection with a well-defined boundary thereof. Without a well-defined boundary there can be no possession. To have possession of a well-defined boundary of land, it is not sufficient that one claim it. He may claim it as long and as loudly as he sees fit, but he does not acquire possession of a foot of it. Mere ownership even is not sufficient in and of itself to give one the possession. In order to the possession of a well-defined boundary of land, it is essential that he enter within it. This he does if he settles on the land. But it is not essential that he live on it. It is sufficient if he incloses a portion of it. Whether anything short of inclosure will constitute such an entry as to give possession it is not necessary to determine. But settlement on or inclosure within a well-defined boundary will not give possession to the extent of the boundary, unless there is an intent to take possession to that extent. If, however, the entry is made under a claim of ownership to the extent of the boundary, the pre-

sumption is that it was the intent to take possession to that extent and it gives possession to that extent.

The well-defined boundary which one may thus acquire possession of need not be set forth in an instrument of writing under which he claims. It is sufficient that it is a well-marked boundary, as was held in the case of Campbell v. Thomas, cited by Judge Barr as above. But what has been said as to acquiring possession of a well-defined boundary by entering within it with the intent to take possession thereof to the extent of the boundary needs qualification. What has been said is true, if nothing else appears than what has thus far been set forth. If, in addition, it appears that the person entering has a right to enter on a part of the land within such boundary, and not to enter on another part thereof, and he enters on the part on which he has a right to enter, he acquires no possession beyond the part on which he has the right to enter; and this, notwithstanding there may be no doubt as to his intent thereby to take possession of the whole boundary. The pioneer case in which this was laid down is the case of Trimble v. Smith, 4 Bibb (Ky.) 257. It has been laid down frequently since. Of the cases in which it has been so held are the following, to wit: Smith v. Mitchell, 1 J. J. Marsh. (Ky.) 270; Wilson v. Stivers, 4 Dana (Ky.) 634; Jones v. McCauley, 2 Duv. (Ky.) 14; Whitley County Land Co. v. Powers' Heirs, 146 Ky. 801, 144 S. W. 2; Curtis v. Warden, 144 Ky. 383, 138 S. W. 245.

The matter decided in those cases is generally put in this way. Where a junior patentee enters outside of the lap between his patent and that of the senior patentee, he acquires no possession of the land within the lap. It is but another way of putting it to say, as I have, that if one enters within a well-defined boundary on the part thereof on which he has the right to enter, he acquires no possession of the part on which he has no right to enter and on which he does not enter. In the Taylor & Crate Case, supra, 185 Fed. at page 861, I directed attention to the two reasons given by Judge Boyle in Trimble v. Smith, for this position, and expressed a preference for the second one, which was that otherwise "a party having the right might be divested of his right without any wrong being in fact done him, or any possibility of knowing that any was intended to be done." Indeed, the whole matter comes down to this, that one cannot divest another of his title to land without entering on it. By confining his entry within a well-defined boundary to the part on which he has the right to enter, he does not enter on the part on which he has no right to enter, and as entry thereon is essential to divest the owner thereof of his title, an entry on the part on which he has the right to enter, no matter how long continued, cannot divest the owner of the other part of his title. Claim of ownership and possession is of no avail here, any more than in any other case. Nor is knowledge of the fact of such claim on the part of the owner of any avail. The one essential thing is that there must be an entry on the land. So, also, if one who has so entered conveys to another the whole of the boundary, and the vendee enters under the deed, but confines his entry to the

part on which the vendor had entered, his possession does not extend to the part on which he has no right to enter.

Thus far I have dealt with the matter of an entry within a well-defined boundary, on a part of which one has the right to enter, and on the other part of which he has no right to enter; the entry being on the part on which he has a right to enter. It is the same if one enters within a well-defined boundary, on the whole of which he has the right to enter, and thereafter enlarges his boundary to a well-defined extent to take in land adjoining on which he has no right to enter, but does not enter on the enlargement. He may make this enlargement by executing a deed conveying a boundary covering both that on which he had entered, and has a right to enter, and the enlargement, or merely by marking the outside boundary of the enlargement. In the latter case he does not acquire possession of the enlargement by the mere marking. Nor in the former case does the vendee entering under the conveyance acquire possession thereof, if his entry is not on the enlargement. Jones v. Patterson (Ky.) 66 S. W. 377; Bowling v. Breathitt Coal, Iron & Lumber Co., 134 Ky. 249, 120 S. W. 317. This is simply another way of putting the position that one cannot acquire possession of land without an entry on it.

If, however, in a case where it appears that the entry has been within a well-defined boundary, on a part of which there was no right to enter, and on a part there was the right to enter, and the entry was on the former part—i. e., the lap or interference—the position just taken as to acquiring possession of a well-defined boundary by entering within it applies in full force. Thereby possession of the well-defined boundary to the extent of the intent to take possession is acquired. If the entry is not under a claim of title, or under a claim of title, but not to any greater extent than the entry; there is no intent to acquire possession, and none is acquired beyond the entry. If, however, the entry is under a claim of title to the whole of the boundary, possession is acquired to its full extent. So, in case of an enlargement—i. e., a case where the original entry is on a boundary on which there was the right to enter, and thereafter the boundary is enlarged, and an entry is made on the enlargement—possession thereof is acquired to the full extent of the intent to take possession. The enlargement may consist simply of the entry. In such a case there is no intent to take possession, and no possession is acquired beyond the entry. If, however, the enlargement consists in marking a boundary and claiming title to the extent thereof, there is an intent to acquire possession, and possession is acquired to the full extent of the boundary. So, if the enlargement consists in executing a conveyance of a boundary covering both that on which he has entered, and had a right to enter, and the enlargement, and the vendee under the conveyance enters on the enlargement, his intent is to take, and he acquires possession, to the full extent of the enlargement, and that whether or not the vendor had theretofore entered on the enlargement, or, if he had entered, it was with the intent to acquire no more possession than to the extent of his entry. In such a case there is an entry on the owner's land under a claim of title to the whole ex-

tent of the boundary, and hence with the intent to take possession thereof. The extent of the possession of the vendor is immaterial. Immediately upon the execution of the conveyance and entry thereunder on the enlargement—i. e., on the part on which there is no right to enter—there is an intent to take possession thereof, and possession thereof is acquired to its full extent, without regard to what may have been the state of the possession previously. I do not think that there can be the slightest doubt as to the correctness of these several positions which I have taken as to the law of possession in this state. It remains to apply these positions to the facts in this case.

The defendant company does not base its claim of ownership to the 4,717.4-acre tract of land, or any part thereof, on anything that transpired prior to the execution of the deeds to Stoll April 30, 1888. The grantors in those deeds had title, at least, to some portions of the land within the several boundaries, which they claimed under certain of the patents issued previously to the Reid patent hereinbefore set forth. Possibly their title under those patents was affected somewhat by certain old Virginia patents located on South Quicksand, hereinbefore referred to. But defendant company does not claim ownership to such portions of that tract as its grantors may have had title to under those patents because of such title. Its claim of ownership to the whole thereof is limited to a title by adverse possession. And to establish title by adverse possession it does not rely on previous possession by any of its grantors. It is likely that certain of its grantors had acquired title to certain small portions of that tract outside of those patents by adverse possession. It is likely, also, that they had not acquired title to the whole thereof outside of those patents in such a way. Indeed, it is not unlikely that at the time they conveyed to Stoll they did not own in any way the bulk of the land which they claimed; i. e., any of the land outside of those patents and such small portions as they had acquired by adverse possession. It is thus that defendant company has been put to the necessity of basing its title to the bulk of the tract by adverse possession, since at least the date of the deed from Stoll to the Kentucky Union Company April 30, 1888. Possibly it might have dated the adverse possession on which it relies from the date of the deeds to Stoll in 1887; and being thus put to this necessity, it has based its title to the whole of the tract thereon.

The entries relied on by the defendant company, which enabled it thus to acquire title to the tract, are located entirely in the bottom land along the course of South Quicksand. As heretofore stated, there is a series of inclosed fields in this bottom from the lower to the upper end. The plaintiff claims that certain of the patents which issued previous to the Reid patent as hereinbefore set forth, with one not heretofore mentioned, stretch continuously from the lower end and to the upper end of the tract along the course of the creek. They are the Rogers & Shipley 50-acre patent, dated January 14, 1823; the Jesse Fugate 25-acre patent, dated April 21, 1860; a R. P. Davis patent of 50 acres, dated May 28, 1868, not heretofore mentioned; the Jonathan Fugate 50-acre patent, dated May 20, 1823; the

William Collins 50-acre patent, dated August 25, 1841; the John Clemons patent, dated December 29, 1852; and the Daniel Duff patent of 50 acres, dated June 23, 1847. According to this location the Williams boundary covers the lower half of the Rogers & Shipley patent; the Jesse Fugate boundary covers the upper half thereof, the Jesse Fugate patent, and the lower half of the Davis patent; the John Fugate boundary covers the upper half of the Davis patent and the Jonathan Fugate patent; and the John Clemons boundary the rest. Possibly the dividing line between the John Fugate and John Clemons patent is on the Jonathan Fugate patent. These patents it claims were intended to cover mainly the bottoms along the creek. The defendant company questions the location of the Rogers & Shipley, Jesse Fugate, and Daniel Duff patents, made by plaintiff's surveyor Gibson. It makes the point that, when he first testified in the case, he made no attempt to locate these three patents, and left the portion of the creek bottoms where he subsequently testified they are located, as above stated, uncovered by any patent previous to the Reid patent. I do not think, however, that this circumstance is against the correctness of his later testimony. A surveyor, like any one else, is entitled to grow in knowledge, and such seems to have been the case here. It is not claimed that his location of those three patents is absolutely accurate. The claim is only that the location of them is substantially correct. And it is not unlikely that this is so. It is possible, however, that this has not been proved to such a certain extent as to justify its being taken to be so. And if the disposition of the case depended on whether the location thereof is substantially correct, I would have to consider more carefully than I have the defendant's criticism thereof and plaintiff's response thereto. I therefore do not determine whether it is substantially correct, but simply assume that it is, and dispose of the case on this basis.

Now it is agreed that this string of patents according to this location covers substantially the series of inclosed fields stretching from the lower to the upper end of the creek. If it were the fact that these fields are entirely within the boundaries of these earlier patents, it would necessarily follow that defendant company has failed to establish title to the tract which it claims by adverse possession; for in that contingency none of the entries on which it relies would be on plaintiff's land. They would be wholly within the boundaries of these senior patents, which, as we have seen, would not give them possession of the lap or interference. Point is made of the fact that in its bill the plaintiff did not exclude from the Reid patent the Collins, Clemons, and Duff patents at the upper end of the creek, and therefore claimed title to so much. It is urged that, even though the entries within these boundaries was not on plaintiff's land, they were on land claimed by it, and that an entry on land claimed by one serves the same purpose as an entry on land owned by him. Without determining the correctness of the legal position thus taken, I do not think that it can be said that plaintiff really claimed the land covered by these patents. The fact that it claimed them in that bill is not con-

clusive of it. Its real claim was to all of the boundary in the Reid patent not covered by the land previously patented or otherwise appropriated, and to no more. The fact that it may have been ignorant as to certain land previously patented does not make out that it really claimed it. Nor do I think that a proper construction of the Reid patent is that it excluded only 25,800 acres of previously patented or otherwise appropriated land. It excluded all the land of that character. It merely stated that it amounted to 25,800 acres.

But it is also agreed that these senior patents do not cover all of these fields. At least they do not cover the two fields at the upper end of the creek, one on the north at the head of McIntosh branch, a tributary of Two Mile, and the other on the north at the mouth of the upper Cane branch. There is another field on the south side, opposite the mouth of Hickory Log branch, towards the lower end of the creek, which I take it is partially outside of the Rogers & Shipley and Jesse Fugate patents, which adjoin a little above the mouth of Hickory Log branch. Though at that point the defendant company's tract runs with the creek, it runs on the south side thereof, so as to include this field. I am not sure as to the position of the parties as to whether this field is wholly within these two patents as thus located, or, if not, how much is without them. They contend so strenuously as to the correctness of Gibson's location of these two patents that I take it that they must concede that it is substantially within those patents according to that location. But, according to the map filed with plaintiff's brief, it seems to me that it is substantially outside of those patents, and I will so treat it. On the basis that it is outside, at least to a certain extent, plaintiff contends that to the extent that it is outside it was otherwise appropriated land, and hence excluded from the Reid patent by its terms. This it makes out by claiming that at the time of the issue of that patent Jesse Fugate and his heirs had acquired title thereto by adverse possession. It is well settled in this state that land can be acquired by adverse possession as against the state. Such was not originally the law. Chiles v. Calk, 4 Bibb (Ky.) 554; Fowke v. Darnall, 5 Litt. (Ky.) 316; Campbell v. Thomas, 9 B. Mon. (Ky.) 82; Hartley v. Hartley, 3 Metc. (Ky.) 56. But it has been the law since the enactment of the Revised Statutes in 1851. Gray v. Soden, 120 Ky. 277, 86 S. W. 515; Asher v. Howard, 122 Ky. 175, 91 S. W. 270; Richie v. Owsley, 137 Ky. 63, 121 S. W. 1015. It is possible here, also, that it has not been proven that this field had been so acquired by adverse possession to such a certain extent as to justify it to be taken as the fact; but, as the determination of this question does not affect the disposition of the case, I assume that it has, and that the land so acquired is otherwise appropriated land within the terms of the patent, and dispose of the case on this basis.

This leaves two other fields to be reckoned with. It is agreed that both of them are outside of the patents senior to the Reid patent. The defendant company does not rely on the one at the head of McIntosh branch as alone giving it title to the land in question. It claims that

this inclosure was maintained for 14 years after April 30, 1888, the date of the Stoll deed—i. e., until the year 1902 only—and that then it was abandoned. It relies on it in connection with an inclosure at the mouth of Deadening Bottom branch, maintained for a period of 8 years just prior to the bringing of the suit; i. e., from the year 1898 and ever since. ·Its position is that the time that this latter inclosure was maintained after the abandonment of the other can be added to the time the former was maintained to get the requisite 15 years of maintenance of an inclosure necessary to give a continuous possession of the tract for that period of time, and cites in support thereof the case of Trueheart v. Graham (Tex. Civ. App.) 141 S. W. 281. I think the position sound. But the inclosure at the mouth of Deadening Bottom branch is within the Duff patent according to Gibson's location, and as I am proceeding on the assumption that this location is correct, nothing can be gained by adding the time that inclosure was maintained after the abandonment of the other to the time it was maintained.

The plaintiff seems to question whether the inclosure at the head of McIntosh branch was maintained the length of time claimed by the defendant company. John Miller and George McIntosh are the only witnesses who gave any testimony bearing on the subject, and it thinks that their testimony comes short of proving that it was maintained as long as claimed by defendant. George McIntosh, who gave his testimony in July, 1910, said that he had known it for 18 years, which would be since 1892, and that it had been maintained until about 8 years before; i. e., until 1902, when the fence was burned, and not afterwards rebuilt. But it is conceded that it was made by William McIntosh, one of Stoll's grantors in the deed for the Clemons boundary, and, if so, it is not unreasonable to infer that it had been maintained, not only since Stoll's deed to the Kentucky Union Company on April 30, 1888, but since at least the deed to Stoll, which was made June 29, 1887. The deeds for the several boundaries to Stoll were made June 28, June 29, and July 4, 1887, and on the latter date he was claiming the entire boundary thereunder, and this inclosure from that date was sufficient to give him possession of the whole. It is therefore not unlikely that this inclosure was maintained for a period of 15 years after that date before the fence was burned, which itself was sufficient to give title to the defendant company to the land in dispute. That it does not appear certainly that the fence was not burned earlier than July 4, 1902, is all that is in the way of its having that effect; and this is probably sufficient to prevent its so doing.

The disposition of the case is thus made to hang on the inclosure at the mouth of Cane branch; i. e., the upper Cane branch, emptying into South Quicksand from the north. It is an extension of an inclosure on the William Collins patent, as to the location of which there seems to be no dispute over and beyond its northern boundary. I do not understand that any question is made as to this inclosure having been maintained continuously from the date of the deed to Stoll April 30, 1888, down to the bringing of the suit. It is attempted to be met in three ways: It is claimed that it had been maintained for 15 years

before the issue of the Reid patent, and hence was then appropriated land and excluded from the patent, just as in the case of the inclosure at the mouth of Hickory Log branch; and, if not, that it was in existence at the date of at least the latest of two of the deeds under which it claims, to wit the deed from the patentee, Reid, to Corry Prague and Dunham, of date November 12, 1874, and the deed from Corry Prague and Dunham to the Breathitt Coal, Iron & Lumber Company, its immediate predecessor in title, of date June 22, 1882, thereby rendering that deed champertous and void as to that inclosure, so that neither that company nor plaintiff acquired title thereto. As at present advised, I am not prepared to say that, if the inclosure was in existence at that date and had such an effect, it makes any difference in the disposition of the case. It is sufficient to say that the evidence does not justify the conclusion, either that it was in existence continuously for 15 years before the issue of the Reid patent, or that it was in existence as early as June 22, 1882.

The other way in which it is attempted to be met is that it was too small to amount to such an entry on plaintiff's land as would give possession of the whole land in dispute. It does not appear just how large it is, other than that, in so far as it extends beyond the William Collins boundary, it is quite a small inclosure. Plaintiff characterizes it as a small clearing. Possibly it is not larger than an acre. It is sufficient, however, to show up distinctly on the map made by plaintiff's surveyor Gibson. In brief of defendant's counsel it is said:

"There never has been a case decided by that court [Court of Appeals of Kentucky] which has held that the inclosure on the interference was too small, or had to be of any particular size or any particular percentage of the land claimed, in order to extend the actual possession over the whole. There are 11 cases decided by that court in which the size of the inclosure is not mentioned at all, or in which the approximate acreage shows it to be very small, and in each of those cases it is held that the possession of the claimant under the junior patent or deed, extended over the whole of the interference of the senior patent, by reason of a part of it being inclosed."

The cases referred to are the following, to wit: Fox v. Hinton, 4 Bibb (Ky.) 559; Thomas v. Harrow, 4 Bibb (Ky.) 563; McDowell v. Kenney's Heirs, 3 J. J. Marsh. (Ky.) 516; Summers v. Green, 4 J. J. Marsh. (Ky.) 137; Ware v. Bryant, 21 S. W. 873, 14 Ky. Law Rep. 852; Davis v. Young, 2 Dana (Ky.) 299; Smith v. Morrow, 7 T. B. Mon. (Ky.) 239; Ratcliff v. Bellfonte Iron Works, 87 Ky. 559, 10 S. W. 365; Whitley County Land Co. v. Lawson, 94 Ky. 603, 23 S. W. 369; Hall v. Roberts, 74 S. W. 199, 24 Ky. Law Rep. 2362; Frye v. McKinley, 136 Ky. 31, 123 S. W. 322. I think these cases bear out this statement and sustain the position that this inclosure is sufficient in itself to bar plaintiff's title. The fact that Stoll's vendor may not have claimed beyond this inclosure and had possession of plaintiff's land to no further extent is not against the Kentucky Union Company entering thereon under the deed to it from Stoll and acquiring possession to the full extent of the boundary of that deed. There is no room to claim that the entry on plaintiff's land was by mistake or clandestine, and thus to bring this case within that of Buford v. Cox, 5 J. J. Marsh.

(Ky.) 582. It must be taken that the entry was purposely made under a claim of ownership, and that it was open and notorious.

I am therefore constrained to hold that the defendant company is the owner of the land in dispute between it and plaintiff, and that the bill be dismissed.